[No. A128197. First Dist., Div. Five. Dec. 21, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
BRADLEY BLACKWELL, Defendant and Appellant.

COUNSEL

Donald Thomas Bergerson for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Laurence K. Sullivan and Seth K. Schalit, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

NEEDHAM, J.—Bradley Blackwell appeals from a judgment sentencing him to prison for life without the possibility of parole (LWOP) after a jury convicted him of first degree murder with felony-murder special circumstances, burglary of an inhabited dwelling, and attempted robbery of an inhabited dwelling. (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(17)(A) & (G), 211, 459, 664.) Although appellant was a minor at the time he committed these offenses, the district attorney elected to directly file the case in adult court under the provisions of Welfare and Institutions Code section 707, subdivision (d).[1]

Appellant argues that we must reverse his LWOP sentence because (1) it exceeds the punishment allowable absent a jury determination of age and violates his Sixth Amendment rights under *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 [147 L.Ed.2d 435, 120 S.Ct. 2348] (*Apprendi*); (2) it amounts to cruel and unusual punishment under the Eighth Amendment as construed in *Graham v. Florida* (2010) 560 U.S. ___ [176 L.Ed.2d 825, 130 S.Ct. 2011] (*Graham*); and (3) its imposition was an abuse of discretion. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

Uriel Carreno was living in the converted garage of his aunt and uncle's home on Joan Drive in Petaluma. On February 7, 2007, he ate lunch with his

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

aunt and then returned to his garage apartment. A friend of Carreno's came by later that afternoon and found him lying on the floor, not moving. Carreno had been shot four times in his side and once in his back and had died of his wounds. A piece of the wood doorjamb was found across the room and a muddy shoeprint was on the door adjacent to the doorknob.

The police found five nine-millimeter shell casings of two different colors within three to five feet of Carreno's body. Forensic testing and the position of the casings revealed that they had all been fired from the same weapon while the shooter was inside the room. The coroner recovered five spent bullets from Carreno's body, all of which had been fired from the same weapon. Two of the bullets had silver jackets (Silvertips) and the other three were of the Black Talon variety. There was no evidence that another firearm had been discharged inside the room during the incident leading to Carreno's death.

Jeffrey Gray, a convicted felon, had seen appellant with a nine-millimeter Beretta during the first part of 2007. Appellant had loaded it with different colored bullets and had told Gray that some of them were solid points and some were hollow points. Appellant had referred to the hollow point bullets as Black Talons.

On the afternoon that Carreno was shot, appellant had called Christopher Ortele and asked for a ride to Petaluma near the Kmart so he could pay his cell phone bill. Ortele was in the process of installing a car stereo for his friend Amber Powell, who agreed to drive. Powell and Ortele picked up appellant, who was with Keith Kellum, and they all drove from Rohnert Park to the Petaluma Kmart, but when Powell was about to turn into the parking lot, either appellant or Kellum told her to go the other way and directed her to a residential neighborhood near the corner of Novak and Joan Drive (the street on which Carreno lived).

After Powell parked the car, appellant and Kellum got out and walked in the direction of Joan Drive, telling Powell to wait for them. When they returned five to 15 minutes later, their demeanor had changed. They got into to car and were very quiet during the ride back. It appeared to Powell that appellant was "tearing up" and Kellum was consoling him.

Jeffrey Gray received a call from appellant that same afternoon and arranged to meet him at a trailer park where Gray was visiting a friend. Appellant, Kellum and appellant's brother Colby Blackwell arrived in Colby's truck, and Gray got into the truck with them. Appellant handed Gray some solvent and a rag and told him he wanted him to go inside a house or garage and wipe down any fingerprints that might be on the door. They pulled up to

a house on Joan Drive, but saw fire trucks, police cars and an ambulance outside. Appellant appeared upset and explained that he had shot a "guy" they were trying to rob.

The group drove back to appellant's house, where appellant told Gray what had happened in greater detail. Appellant said that he and Kellum had gone to Petaluma to rob a guy of some money and dope (crystal methamphetamine) and that Kellum had kicked in the door of the garage. Appellant claimed that when he went into the garage the guy inside took a shot at him, so he shot back several times.

Also on the day of the shooting, appellant called his girlfriend, Jacqueline Pollard, and asked her to come to his house. He sounded very anxious on the phone. When Pollard arrived she found appellant and Kellum stripped to their boxer shorts. Appellant took her into the bathroom and told her in a "frantic" manner that he had got a ride to Petaluma with some girl he did not know and had shot someone dead. Appellant told Pollard that he and Kellum had gone to a house, touched a doorknob, and kicked another door down, and he was afraid there would be fingerprints and a footprint on two separate doors. He claimed that when they entered the room the person inside had fired a shot between his head and Kellum's, so appellant fired a few shots into his chest. Appellant admitted to Pollard that he had used his own gun, a semiautomatic that Pollard had seen before. He told Pollard that he and Kellum were going to burn their clothes, and mentioned a pair of shoes and a jacket that would be placed in a backpack along with the gun and some extra bullets. Pollard saw a backpack containing loose bullets and shoes in appellant's bedroom, and appellant said he was going to bury it.

Sometime later, appellant told Pollard that he was concerned that too many people knew the gun was in the bag and where it was buried. He drove her into the Santa Rosa hills and asked her whether she thought he should move it. She told him it might not be a good idea because they had been stopped by the police a number of times in the car they were driving.

On a visit to Bryan Fishtrom's house in March or April 2007, appellant was carrying a dirty bandana that contained a semiautomatic handgun, bullets, and a lot of mud. The bullets were of different colors and some had hollow tips.

In March 2007, Jeffrey Gray was picked up on a parole violation and told the police what he knew about appellant's involvement in Uriel Carreno's murder. In April 2007, after he was released, Gray saw appellant and his brother, Gary Blackwell, at Bryan Fishtrom's house. Appellant and his brother asked Gray how he had gotten out of jail, and appellant suggested that they go for a ride together. Gray declined.

In May 2007, appellant's brother, Colby Blackwell, directed police officers to a 50-gallon drum in a rural area. Colby moved the drum, revealing a hole in the ground that contained wet clothing, shoes, pieces of a rifle-cleaning kit, five rounds of nine-millimeter ammunition, and rifle grease. A T-shirt bore the imprint of a gun and had rust stains consistent with a Beretta nine-millimeter handgun.

Appellant was interviewed by the police and initially denied knowing anything about Carreno's murder. Later, he said that he and Kellum had gone to a house to "burn a guy for drugs," and that Kellum had kicked open the door and shot the person inside several times He told the officers that he knew before they went that Kellum had a handgun, that his brother Colby had buried some of the evidence, and that he (appellant) had sold the gun that Kellum used in Santa Rosa.

Based on the foregoing evidence, appellant was tried before a jury and convicted of first degree murder with felony-murder special circumstances (murder in the commission of an attempted robbery and a burglary or attempted burglary), burglary of an inhabited dwelling house, and attempted robbery of an inhabited dwelling house. The jury rejected allegations that appellant had personally used and/or intentionally discharged a firearm in the commission of these offenses, causing death or great bodily injury. (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(17)(A) & (G), 211, 459, 664, 1203.06, subd. (a)(1), 12022.5, subd. (a), 12022.53, subds. (b)–(d).) Keith Kellum had originally been charged as a codefendant, but he pled guilty to second degree murder before the jury was sworn.

After the jury returned its verdict, appellant's trial counsel filed a sentencing memorandum arguing that under *Apprendi, supra*, 530 U.S. 466, the court could not impose an "adult" sentence without a jury finding regarding appellant's age at the time of the offenses. The court rejected this argument and imposed an LWOP term on the murder count. It acknowledged that it had the discretion to impose a lesser term of 25 years to life because appellant was under 18 when he committed the murder (see Pen. Code, § 190.5), but it declined to exercise that discretion in light of appellant's long juvenile court history and the "heinous" nature of the current offenses.

## II. DISCUSSION

### A. *Jury Finding of Appellant's Age Under* Apprendi

Appellant argues that his LWOP sentence is unauthorized because the jury did not make a finding regarding his age at the time of the offenses. We disagree.

The probation report indicates that appellant was born on August 9, 1989, making him 17 years old when the offenses were committed in February of 2007. Although minors who commit crimes are generally subject to the jurisdiction of the juvenile court, the law provides for a number of exceptions. (See §§ 602, subd. (b), 707, subds. (a)–(d); *People v. Cardona* (2009) 177 Cal.App.4th 516, 523–526 [99 Cal.Rptr.3d 313] (*Cardona*).)

Under section 602, subdivision (b), a minor who is 14 years of age or older must be prosecuted as an adult if he or she is alleged to have personally killed the victim during a special circumstance murder or to have committed enumerated forcible sex offenses. Section 707, subdivision (d) allows the prosecution to directly file specified charges against certain minors in adult court, without a judicial determination that the minor is unfit for treatment under the juvenile law. Section 707, subdivisions (b) and (c) provide that a minor 14 years of age or older may be prosecuted as an adult for enumerated offenses if found unfit for treatment under the juvenile law, there being a presumption of unfitness. And section 707, subdivision (a)(1) provides that minors accused of other crimes will be treated as juveniles unless they are 16 years of age or older and are demonstrated to be unfit for treatment under the juvenile law. (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 548–551 [117 Cal.Rptr.2d 168, 41 P.3d 3] (*Manduley*).)

Here, the prosecution directly filed charges against appellant in adult court. It relied on section 707, subdivision (d)(2)(A), which provides, "[T]he district attorney or other appropriate prosecuting officer may file an accusatory pleading against a minor 14 years of age or older in a court of criminal jurisdiction in any case in which any one or more of the following circumstances apply: [¶] . . . The minor is alleged to have committed an offense that if committed by an adult would be punishable by death or imprisonment in the state prison for life." The criminal complaint and the information both alleged that appellant "was a minor who was at least 14 years of age at the time of the commission of the above offenses."

Appellant does not dispute the prosecution's authority to directly file a murder charge in adult court when the minor is 14 years of age or older and charged with murder. (See *Manduley, supra,* 27 Cal.4th at pp. 562, 567, 573, 581 [rejecting various constitutional challenges to direct-filing provision of § 707, subd. (d)].) Nor does he argue that his case should have been handled in juvenile court. Rather, he claims that the imposition of an "adult sentence" violated his Sixth Amendment right to a jury trial because the jury in his case was never asked to determine whether he was "at least 14 years of age" when he committed the offenses. Appellant relies on the rule set forth in *Apprendi,* in which the United States Supreme Court held: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the

prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi, supra,* 530 U.S. at p. 490.)

Appellant's argument appears to go as follows: Had he been treated as a juvenile and found to have committed the charged offenses, he would have been made a ward of the juvenile court and committed to the Division of Juvenile Facilities for a period lasting up until his 25th birthday. (See § 607, subd. (b); *Cardona, supra,* 177 Cal.App.4th at p. 530.) A juvenile commitment until the age of 25 was, therefore, the statutory maximum commitment under *Apprendi* unless the prosecution proved under section 707, subdivision (d)(2)(A) that (1) he committed an offense which would be punishable by life imprisonment if committed by an adult, and (2) he was 14 years of age or older—circumstances that would in turn allow the prosecution to directly file the case in adult court and, consequently, secure adult court punishment. Appellant argues that because the jury was never asked to determine his age, it never made a finding on the second "element" allowing for greater punishment as an adult. We disagree.

■ *Apprendi* and its progeny (e.g., *Ring v. Arizona* (2002) 536 U.S. 584, 609 [153 L.Ed.2d 556, 122 S.Ct. 2428]; *Blakely v. Washington* (2004) 542 U.S. 296, 303–304 [159 L.Ed.2d 403, 124 S.Ct. 2531]; *United States v. Booker* (2005) 543 U.S. 220, 233, 243 [160 L.Ed.2d 621, 125 S.Ct. 738]; *Cunningham v. California* (2007) 549 U.S. 270, 274–275 [166 L.Ed.2d 856, 127 S.Ct. 856]) "are rooted in the historic jury function—determining whether the prosecution has proved each element of an offense beyond a reasonable doubt." (*Oregon v. Ice* (2009) 555 U.S. 160, 163 [172 L.Ed.2d 517, 129 S.Ct. 711] [decision to impose consecutive sentences not subject to *Apprendi*].) The Supreme Court "has not extended the *Apprendi* . . . line of decisions beyond the offense-specific context that supplied the historic grounding for the decisions." (555 U.S. at p. 163.) It is "important to recognize that, under the [*Apprendi*] line of high court decisions . . . , the constitutional requirement of a jury trial and proof beyond a reasonable doubt applies only to a fact that is 'legally essential to the punishment' [citation], that is, to 'any fact that exposes a defendant to a greater potential sentence' than is authorized by the jury's verdict alone [citation]." (*People v. Black* (2007) 41 Cal.4th 799, 812 [62 Cal.Rptr.3d 569, 161 P.3d 1130].)

Appellant was charged with and convicted of special circumstance murder, residential burglary, and attempted residential robbery. Age was not an element of any of these offenses, rather, "the resolution of appellant's age merely determine[d] which branch of the superior court [would] decide his guilt or innocence." (*People v. Nguyen* (1990) 222 Cal.App.3d 1612, 1621 [272 Cal.Rptr. 523] (*Nguyen*); see also *People v. Marquez* (1992) 1 Cal.4th 553, 580 [3 Cal.Rptr.2d 710, 822 P.2d 418] [age is not an element of murder

under Pen. Code, § 190.5 and is not material to guilt].) In light of the murder charge, the district attorney was authorized to directly file this case in adult court without a finding that appellant was unfit to be treated as a juvenile, so long as he was 14 years of age or older at the time of the offenses. (§ 707, subd. (d).) If appellant had believed the case was not properly before the adult court due to his actual age, it was his duty to object to that forum and to prove by a preponderance of the evidence that he did not meet the age criterion for direct filing. (See *In re Harris* (1993) 5 Cal.4th 813, 837–838 [21 Cal.Rptr.2d 373, 855 P.2d 391] (*Harris*); *People v. Level* (2002) 97 Cal.App.4th 1208, 1211–1213 [119 Cal.Rptr.2d 551]; *Nguyen*, at p. 1619.)[2]

Appellant did not object to being prosecuted in adult court and is now precluded from arguing that the case should have been handled by the juvenile court. (*Harris, supra*, 5 Cal.4th at pp. 837–838.) Because his case was heard in adult court, the "maximum penalty" for *Apprendi* purposes was determined when the jury returned its guilty verdict on the charge of first degree murder with special circumstances. No additional fact finding by the judge was required to impose an "adult" sentence.

Our conclusion that *Apprendi* did not require a jury finding on appellant's age is consistent with the holding in *Cardona, supra*, 177 Cal.App.4th 516, in which the court considered a similar issue regarding the right to a jury determination of the facts rendering a juvenile eligible for prosecution as an adult. In *Cardona*, the defendant was charged with committing a number of felony sexual offenses while he was between the ages of 16 and 18 that rendered him at least presumptively unfit to be dealt with under juvenile court law. (*Id.* at pp. 521–526.) The trial court concluded the defendant was unfit for treatment as a juvenile after considering the statutory criteria for fitness under section 707, subdivision (c), which include: "(1) The degree of criminal sophistication exhibited by the minor. [¶] (2) Whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction. [¶] (3) The minor's previous delinquent history. [¶] (4) Success of previous attempts by the juvenile court to rehabilitate the minor. [¶] (5) The circumstances and gravity of the offenses alleged in the petition to have been committed by the minor." Relying on *Apprendi*, the defendant argued on appeal that the jury, rather than the trial court, should have determined the issue of fitness, and that his prison sentence of 30 years to life was unauthorized absent such a finding. (*Cardona*, at pp. 521, 528.)

The appellate court in *Cardona* rejected the claim. It explained: "The factual findings involved in a fitness determination are not the functional equivalent of an element of a crime. 'The sole purpose of the fitness hearing

[2] A defendant bears the burden of proof on the issue of age. (*Nguyen, supra*, 222 Cal.App.3d at pp. 1618–1623; see also Pen. Code, § 190.5, subd. (a).)

is to determine whether the best interest of the minor and of society will be served by retention in the juvenile court or whether the minor should be tried as an adult. [Citation.]' [Citation.] A transfer hearing 'does not directly result in an adjudication of guilt or delinquency' [citation], and the question of a minor's amenability to treatment within the juvenile court system is concerned with the child's prospects for rehabilitation, not the degree of his or her criminal culpability [citation]. A finding that a minor is not amenable to treatment in the juvenile system 'does not increase the maximum penalty one can receive if punished according to the facts as reflected in the jury verdict alone.' [Citation.] Moreover, even assuming juveniles have indeed historically been afforded the right to trial by jury on allegations they committed a crime [citation], we are aware of no historical practice extending that right to a fitness determination. [¶] The constitutional concerns expressed in *Apprendi* and its progeny were satisfied in the present case by the jury's finding, beyond a reasonable doubt, of those facts legally essential to the punishment imposed, viz., that appellant committed the offenses. Appellant's sentence was fully authorized by the jury verdict; the statutory provision for judicial factfinding with respect to amenability to treatment in the juvenile court system is not 'a legislative attempt to "remove from the [province of the] jury" the determination of facts that warrant punishment for a specific statutory offense . . . . [A]s *Apprendi*'s core concern is inapplicable to the issue at hand, so too is the Sixth Amendment's restriction on judge-found facts.' " (*Cardona, supra*, 177 Cal.App.4th at p. 532.)

■ Similarly, the facts that subjected appellant to a direct filing in criminal court under section 707, subdivision (d)(1)—his age and the nature of the charges against him—do not implicate *Apprendi*'s core concern, namely "the historic right to a trial by jury on all elements of an offense, which would be jeopardized if a legislature could label facts affecting the length of the authorized sentence for an offense as something other than elements, thereby eliminating the right to a jury trial thereon." (*Cardona, supra*, 177 Cal.App.4th at p. 530.) The Sixth Amendment was not violated by the direct filing of criminal charges in adult court, or by the imposition of an "adult" sentence without a jury determination of appellant's age.

■ What, then, was the maximum sentence authorized by the verdict? The mandatory sentence for an adult defendant convicted of first degree special circumstance murder is LWOP when the death penalty has not been sought. (Pen. Code, §§ 190, subd. (a), 190.2, subd. (a).) Penal Code section 190.5, subdivision (b), provides for a presumptive term of LWOP when the defendant was 16 or 17 years old at the time of the offense but allows the court to impose a lesser sentence of 25 years to life in its discretion. (*People v. Demirdjian* (2006) 144 Cal.App.4th 10, 17 [50 Cal.Rptr.3d 184].) And a defendant who was age 14 or 15 at the time he or she committed a special circumstance murder would face a maximum sentence of 25 years to life if

prosecuted as an adult. (*Ibid.*) Thus, LWOP is the statutory maximum sentence for a defendant tried in adult court who is 16 years of age or older and 25 years to life is the maximum sentence for a defendant who is 14 or 15 years of age. (*Ibid.*)

We do not understand appellant to be arguing that the maximum sentence in his case was limited to 25 years to life absent a finding that he was at least 16 years old at the time he committed the offenses. In any event, we view the fact of a defendant's age in this three-tiered structure for special circumstance murder in a noncapital case (LWOP for defendants who were age 18 or over, LWOP or 25 years to life for defendants who were ages 16 or 17, and 25 years to life for defendants who were ages 14 or 15) as a circumstance that mitigates punishment, as to which the right to a jury trial under *Apprendi* does not apply. (See *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1229–1230 [65 Cal.Rptr.3d 177]; *People v. Cleveland* (2001) 87 Cal.App.4th 263, 267 [104 Cal.Rptr.2d 641].) Because the court determined that appellant was 17 years old at the time of his offense, the maximum sentence for *Apprendi* purposes was LWOP.

Even if we assume the jury should have determined whether appellant was 14 years of age or older, the failure to obtain such a finding was harmless beyond a reasonable doubt. (*Washington v. Recuenco* (2006) 548 U.S. 212, 221 [165 L.Ed.2d 466, 126 S.Ct. 2546]; *People v. Sandoval* (2007) 41 Cal.4th 825, 838 [62 Cal.Rptr.3d 588, 161 P.3d 1146].) The charging documents alleged that appellant was over 14, and his age was uncontested at trial. The probation report indicates that appellant was 17 years old when he committed the charged offenses, and reveals that his active history with the juvenile justice system began in 2002, making it highly unlikely he was still under the age of 14 when he committed the current offenses in 2007. In a pretrial motion to set aside the information under Penal Code section 995, the defense asserted that appellant "was 17 years old at the time of the alleged offense." During his police interview, appellant essentially admitted that he was 17. Had the issue been submitted to the jury, the verdict would have surely authorized the sentence imposed. (*Sandoval*, at p. 838.)

## B.  *LWOP Sentence as Cruel and Unusual Punishment*

Appellant contends the imposition of an LWOP sentence for murder amounted to cruel and unusual punishment because he was a minor when he committed that offense. He claims that an LWOP sentence is categorically prohibited in cases where a murder conviction against a defendant who was under age 18 rests on a theory of aiding and abetting. Appellant alternatively argues that an LWOP sentence is constitutionally disproportionate to his culpability under the particular facts of his case. We are not persuaded.

Appellant relies primarily on *Graham*, in which the United States Supreme Court held that the cruel and unusual punishment clause of the Eighth Amendment prohibits an LWOP sentence for juvenile offenders who have not committed a homicide. (*Graham, supra*, 560 U.S. at p. ___ [130 S.Ct. at p. 2030].) Because "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers" (*id.* at p. ___ [130 S.Ct. at p. 2027]), and because juveniles are, by reason of their immaturity, less culpable when compared to adults (*id.* at p. ___ [130 S.Ct. at p. 2026]), the practice of sentencing minors to LWOP is unconstitutional in nonhomicide cases (*id.* at p. ___ [130 S.Ct. at p. 2030]).

*Graham* is not controlling here because appellant was convicted of first degree murder with special circumstances—the most serious variant of homicide offenses. "While we agree that the punishment is very severe, the People of the State of California in enacting [Penal Code section 190.5] have made a legislative choice that some 16- and 17-year-olds, who are tried as adults, and who commit the adult crime of special circumstance murder, are presumptively to be punished with LWOP. We are unwilling to hold that such a legislative choice is necessarily too extreme, given the social reality of the many horrendous crimes, committed by increasingly vicious youthful offenders, which undoubtedly spurred the enactment." (*People v. Guinn* (1994) 28 Cal.App.4th 1130, 1147 [33 Cal.Rptr.2d 791]; see also *People v. Em* (2009) 171 Cal.App.4th 964, 966–967, 971–977 [90 Cal.Rptr.3d 264] [two consecutive 25-year-to-life sentences, one for murder and one for a vicarious arming enhancement, did not amount to cruel and unusual punishment where defendant was 15 years old at the time of the offense and was not the actual shooter]; *People v. Demirdjian, supra*, 144 Cal.App.4th at pp. 13–16 [two consecutive terms of 25 years to life were not cruel and unusual punishment for two special-circumstance murders committed when the defendant was 15].)

Recognizing that *Graham* is limited on its face to nonhomicide cases, appellant argues that its rationale applies with equal force to a juvenile defendant who, albeit convicted of murder, has not personally taken a life. According to appellant, the jury's rejection of the firearm enhancement allegations demonstrates that he was convicted as an aider and abettor on a felony-murder theory. From this, he reasons that he was actually convicted of intentionally aiding and abetting nonhomicide offenses (i.e., the residential burglary and attempted residential robbery on which the felony-murder theory and special circumstances were based) "and became eligible for life without parole only because someone else fired a fatal shot."

This rather creative description of appellant's murder conviction mischaracterizes the implications of the jury's verdict. The jury's rejection of the

firearm allegations may simply reflect "a reasonable doubt in the minds of the jurors that [appellant] specifically used a [gun]. *It does not show the reverse, that the jury specifically found [that appellant] was an aider and abettor. . . .* The jury may merely have believed, and most likely did believe, that [appellant] was guilty of murder as either a personal [gun] user or an aider and abettor but *it may have been uncertain exactly which role [appellant] played.*" (*People v. Santamaria* (1994) 8 Cal.4th 903, 919 [35 Cal.Rptr.2d 624, 884 P.2d 81]; see also *People v. Thompson* (2010) 49 Cal.4th 79, 120 [109 Cal.Rptr.3d 549, 231 P.3d 289].)

■ Even if we assume appellant was convicted as an aider and abettor under a felony-murder theory, it does not follow that an LWOP sentence is categorically barred. Juvenile defendants convicted of murder simply do not stand in shoes similar to those of juveniles convicted of nonhomicide offenses. "Serious nonhomicide crimes 'may be devastating in their harm . . . but "in terms of moral depravity and of the injury to the person and to the public," . . . they cannot be compared to murder in their "severity and irrevocability." ' " (*Graham, supra*, 560 U.S. at p. ___ [130 S.Ct. at p. 2027].) Moreover, the jury could not have found the felony-murder special circumstance to be true unless it determined that appellant, if not the actual killer, either intended to kill or was a major participant in the underlying felony and acted with reckless indifference to human life. (Pen. Code, § 190.2, subd. (d); *People v. Estrada* (1995) 11 Cal.4th 568, 575 [46 Cal.Rptr.2d 586, 904 P.2d 1197]; see also *Tison v. Arizona* (1987) 481 U.S. 137 [95 L.Ed.2d 127, 107 S.Ct. 1676].) Such conduct, even when committed by a person who is 16 or 17 years of age, is highly culpable and may justify an LWOP sentence.[3]

■ The court in *Graham* applied a two-step approach appropriate for categorical challenges to punishment as cruel and unusual: "The Court first considers 'objective indicia of society's standards, as expressed in legislative enactments and state practice' to determine whether there is a national consensus against the sentencing practice at issue. [Citation.] Next, guided by 'the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose,' [citation], the Court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution." (*Graham, supra*, 560 U.S. at p. ___ [130 S.Ct. at p. 2022].) Appellant has not even attempted to argue that there is a national consensus

---

[3] We need not consider whether an LWOP sentence is permissible in murder cases where the defendant is younger than 16, as the maximum sentence for such a defendant is 25 years to life under California law. The United States Supreme Court is currently considering whether an LWOP sentence may be constitutionally applied to a defendant convicted of murder who was 14 years old at the time of the offense. (*Jackson v. Hobbs*, No. 10-9647, cert. granted Nov. 7, 2011; *Miller v. Alabama*, No. 10-9646, cert. granted Nov. 7, 2011.)

against imposing an LWOP sentence in a case where a 16- or 17-year-old defendant committed a homicide offense that would have rendered him eligible for the death penalty had he been an adult. Nor has he cited any Eighth Amendment jurisprudence supporting such a claim. The reasoning of *Graham* cannot be stretched to categorically bar LWOP sentences for juveniles who aid and abet a homicide, particularly when that homicide is a first degree special circumstance murder.

Having rejected appellant's claim that we should extend *Graham*'s categorical prohibition of LWOP sentences to juveniles convicted of homicide offenses under a theory of aiding and abetting, we turn to his argument (summarily presented) that an LWOP sentence is disproportionate to his individual culpability and amounts to cruel and unusual punishment in his particular case. We reject the claim.

■ A sentence in an individual case violates the Eighth Amendment proscription against cruel and unusual punishment only if it is grossly disproportionate to the crime. (*Graham, supra,* 560 U.S. at p. ___ [130 S.Ct. at p. 2021]; *Solem v. Helm* (1983) 463 U.S. 277, 288–289 [77 L.Ed.2d 637, 103 S.Ct. 3001].) "A court must begin by comparing the gravity of the offense and the severity of the sentence. [Citation.] '[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality' the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions." (*Graham,* at p. ___ [130 S.Ct. at p. 2022].)

■ California Constitution, article I, section 17, prohibits punishment that is cruel *or* unusual. Under this provision, a sentence will not be allowed to stand when it is so disproportionate to the crime committed that it shocks the conscience and offends fundamental notions of human dignity, considering defendant's history and the nature of the offense. (*In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921]; *People v. Haller* (2009) 174 Cal.App.4th 1080, 1092 [94 Cal.Rptr.3d 846].) Much like Eighth Amendment analysis, we consider the nature of the offense and the offender, with particular regard to the danger each presents to society, as well as the penalties prescribed in this state for more serious offenses and those prescribed in other states for the same offense. (*Haller,* at p. 1092.)

The sentence in this case, though undoubtedly harsh, does not shock the conscience and is not disproportionate. First degree special circumstance murder, viewed in the abstract, is perhaps the most serious offense under California law, and the facts of this particular case do not remove it from this category. Appellant and his cohort Keith Kellum went to the victim's

apartment unannounced, apparently intending to rob him of drugs and/or money, kicked down his door, and shot him several times. Even if appellant was not the shooter (and the evidence was very strong that he was, notwithstanding the jury's findings on the firearm enhancements), he told police that he knew ahead of time that Kellum was carrying a gun. By finding the special circumstances true, the jury necessarily found that appellant, if not the actual shooter, either intended to kill or acted as a major participant in the burglary and attempted robbery and with reckless indifference to human life.

Nor is appellant's individual culpability mitigated by his background. Though he was still six months short of the age of majority when he committed the murder in this case, his criminal history as a juvenile was extensive. It began with an adjudication for theft in December 2002, when appellant was 13 years old, and includes a number of adjudications for offenses involving drugs, weapons, battery, and the harassment of a girlfriend. Appellant escaped from juvenile custody several times, was suspended from school based on his "defiance," and in 2006 was described by juvenile camp staff as "criminally sophisticated." He was involved in physical altercations while in custody and was identified as a "shot caller" within his jail unit after his arrest in this case.

In light of his history and the very serious nature of his crime, appellant has not demonstrated that his LWOP sentence is disproportionate to his individual culpability. He has not even attempted to argue that it is disproportionate when compared to the sentences of other offenders. In short, this is not the "rare case" in which the prescribed statutory penalty for the offense is constitutionally excessive. (See *People v. Mendez* (2010) 188 Cal.App.4th 47, 68 [114 Cal.Rptr.3d 870].)

### C. *Abuse of Discretion in Imposing LWOP Sentence*

Penal Code section 190.5, subdivision (b) provides, "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances . . . has been found to be true . . . who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life." Appellant argues that the court abused its discretion when it imposed a sentence of LWOP, rather than the lesser term of 25 years to life. We disagree.

Section 190.5 establishes a presumptive penalty of LWOP for a 16 or 17 year old convicted of special circumstances murder, but allows the court to exercise its discretion and impose a lesser sentence of 25 years to life.

(*People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1088 [83 Cal.Rptr.3d 340] (*Ybarra*); *People v. Guinn, supra*, 28 Cal.App.4th at p. 1145.) Thus, the trial court was required to impose an LWOP sentence unless it exercised its discretion under the statute to impose a term of 25 years to life. (*Ybarra*, at p. 1088; *Guinn*, at p. 1145.) A court's exercise of discretion will not be disturbed on appeal absent a showing that the court acted in an arbitrary, capricious, or patently absurd way, resulting in a manifest miscarriage of justice. (*People v. Jordan* (1986) 42 Cal.3d 308, 316 [228 Cal.Rptr. 197, 721 P.2d 79].)

Here, the trial court was well aware that it could sentence appellant to 25 years to life in lieu of LWOP. It declined to do so, based on appellant's history and the heinous nature of the offense. This was not an abuse of discretion, because a reasonable jurist could conclude that the circumstances of the case did not warrant a deviation from the presumptive LWOP sentence. This case is unlike *Ybarra, supra*, 166 Cal.App.4th at pages 1088–1094, in which the appellate court remanded the matter for a reconsideration of the appropriate sentence under Penal Code section 190.5 because the trial court was unaware it had discretion to select a 25-year-to-life term.

## III. DISPOSITION

The judgment is affirmed.

Jones, P. J., and Simons, J., concurred.

A petition for a rehearing was denied January 17, 2012, and appellant's petition for review by the Supreme Court was denied March 14, 2012, S199767.