Filed 6/20/13  P. v. Blackwell CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>BRADLEY BLACKWELL,<br><br>      Defendant and Appellant. | A128197<br><br>(Sonoma County<br>Super. Ct. No. SCR511523) |

Appellant Bradley Blackwell was sentenced to prison for a term of life without the possibility of parole (LWOP) following his conviction by jury trial of first degree murder with felony-murder special circumstances and other offenses, which were committed when he was 17 years old.  He appealed, arguing his LWOP sentence should be reversed because (1) it exceeded the punishment allowable absent a jury determination of his age and violated his Sixth Amendment rights under *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 (*Apprendi*); (2) it amounted to cruel and unusual punishment under the Eighth Amendment of the federal Constitution because he was a juvenile at the time of the offenses; and (3) it was an abuse of discretion.

In *People v. Blackwell* (2011) 202 Cal.App.4th 144 (*Blackwell*), we rejected these claims and affirmed the judgment.  Appellant's petition for review was denied by the California Supreme Court (March 14, 2012, S199767), but the United States Supreme Court granted his petition for writ of certiorari, vacated the judgment, and remanded the case to this court for reconsideration in light of *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455] (*Miller*), which was decided after the issuance of our original opinion,

1

and which held that mandatory LWOP sentences for homicide amount to cruel and unusual punishment under the Eighth Amendment when they are imposed on a defendant who was a juvenile at the time of the offense. We asked the parties to submit supplemental briefing on the issue.[1] Having reconsidered the case in light of *Miller*, we remand the case to the trial court for resentencing.

## I. FACTS AND PROCEDURAL HISTORY

Uriel Carreno was living in the converted garage of his aunt and uncle's home on Joan Drive in Petaluma. On February 7, 2007, he ate lunch with his aunt and then returned to his garage apartment. A friend of Carreno's came by later that afternoon and found him lying on the floor, not moving. Carreno had been shot four times in his side and once in his back and had died of his wounds. A piece of the wood doorjamb was found across the room and a muddy shoeprint was on the door adjacent to the doorknob.

The police found five nine-millimeter shell casings of two different colors within three to five feet of Carreno's body. Forensic testing and the position of the casings revealed they had all been fired from the same weapon while the shooter was inside the room. The coroner recovered five spent bullets from Carreno's body, all of which had been fired from the same weapon. Two of the bullets had silver jackets (Silvertips) and the other three were of the Black Talon variety. There was no evidence another firearm had been discharged inside the room during the incident leading to Carreno's death.

Jeffrey Gray, a convicted felon, had seen appellant with a nine-millimeter Beretta during the first part of 2007. Appellant had loaded it with different colored bullets and had told Gray some of them were solid points and some were hollow points. Appellant had referred to the hollow point bullets as Black Talons.

On the afternoon Carreno was shot, appellant had called Christopher Ortele and asked for a ride to Petaluma near the Kmart so he could pay his cell phone bill. Ortele was in the process of installing a car stereo for his friend Amber Powell, who agreed to drive. Powell and Ortele picked up appellant, who was with Keith Kellum, and they all

---

[1] Appellant's retained counsel has not filed a brief in response to our request.

2

drove from Rohnert Park to the Petaluma Kmart, but when Powell was about to turn into the parking lot, either appellant or Kellum told her to go the other way and directed her to a residential neighborhood near the corner of Novak and Joan Drive (the street on which Carreno lived).

After Powell parked the car, appellant and Kellum got out and walked in the direction of Joan Drive, telling Powell to wait for them. When they returned five to 15 minutes later, their demeanor had changed. They got into the car and were very quiet during the ride back. It appeared to Powell that appellant was "tearing up" and Kellum was consoling him.

Jeffrey Gray received a call from appellant the same afternoon and arranged to meet him at a trailer park where Gray was visiting a friend. Appellant, Kellum and appellant's brother Colby Blackwell arrived at the trailer park in Colby's truck, and Gray got into the truck with them. Appellant handed Gray some solvent and a rag and told him he wanted him to go inside a house or garage and wipe down any fingerprints that might be on the door. They pulled up to a house on Joan Drive, but saw fire trucks, police cars, and an ambulance outside. Appellant appeared upset and said he had shot a guy they were trying to rob.

The group drove back to appellant's house, where appellant told Gray what had happened in greater detail. Appellant said he and Kellum had gone to Petaluma to rob a guy of some money and dope (crystal methamphetamine). Kellum had kicked in the door of the garage. Appellant claimed that when he went into the garage the guy inside took a shot at him, so he shot back several times.

Also on the day of the shooting, appellant called his girlfriend, Jacqueline Pollard, and asked her to come to his house. He sounded very anxious on the phone. When Pollard arrived she found appellant and Kellum stripped to their boxer shorts. Appellant took her into the bathroom and told her in a "frantic" manner he had been driven to Petaluma by some girl he didn't know and had shot someone dead. Appellant told Pollard he and Kellum had gone to a house, touched a doorknob, and kicked another door down, and he was afraid there would be fingerprints and a footprint on two separate

3

doors.  He claimed that when they entered the room the person inside had fired a shot between his head and Kellum's, so appellant fired a few shots into the person's chest.  Appellant admitted he had used his own gun, a semiautomatic that Pollard had seen before.  He said he and Kellum were going to burn their clothes, and mentioned a pair of shoes and a jacket that would be placed in a backpack along with the gun and some extra bullets.  Pollard saw a backpack containing loose bullets and shoes in appellant's bedroom, and appellant said he was going to bury it.

Sometime later, appellant told Pollard he was concerned that too many people knew the gun was in the bag and where it was buried.  He drove her into the Santa Rosa hills and asked her whether she thought he should move it.  She told him it might not be a good idea because they had been stopped by the police a number of times in the car they were driving.

On a visit to one Bryan Fishtrom's house in March or April 2007, appellant was carrying a dirty bandana that contained a semi-automatic handgun, bullets, and a lot of mud.  The bullets were of different colors and some had hollow tips.

In March 2007, Jeffrey Gray was picked up on a parole violation and told the police what he knew about appellant's involvement in Uriel Carreno's murder.  In April 2007, after he was released, Gray saw appellant and his brother Gary Blackwell at Bryan Fishtrom's house.  Appellant and his brother asked Gray how he had gotten out of jail, and appellant suggested they go for a ride together.  Gray declined.

In May 2007, appellant's brother Colby Blackwell directed police officers to a 50-gallon drum in a rural area.  Colby moved the drum, revealing a hole in the ground that contained wet clothing, shoes, pieces of a rifle cleaning kit, five rounds of nine-millimeter ammunition, and rifle grease.  A tee shirt bore the imprint of a gun and had rust stains consistent with a Beretta nine-millimeter handgun.

Appellant was interviewed by the police and initially denied knowing anything about Carreno's murder.  Later, he told them he and Kellum had gone to a house to "burn a guy for drugs," and Kellum had kicked open the door and shot the person inside several times.  Appellant admitted that he knew before they went to the house that Kellum had a

4

handgun.  He acknowledged that his brother Colby had buried some of the evidence, and that he (appellant) had sold the gun that Kellum used in Santa Rosa.

Based on the foregoing evidence, appellant was charged with first degree murder with felony-murder special circumstances (murder in the commission of an attempted robbery and a burglary or attempted burglary), burglary of an inhabited dwelling house, and attempted robbery in an inhabited dwelling house, along with allegations of personal firearm use.  (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(17)(A) & (G), 211, 459, 664; 1203.06, subd. (a)(1), 12022.5, subd. (a); 12022.53, subds. (b)-(d).)  Although appellant was 17 years old at the time of the killing, the district attorney elected to directly file the case in adult court under Welfare and Institutions Code section 707, subdivision (d).

A jury convicted appellant of the substantive charges and found the special circumstance allegations to be true, though it rejected the firearm allegations.[2]  After the jury returned its verdict, appellant filed a sentencing memorandum arguing that under *Apprendi*, *supra*, 530 U.S. 466, the court could not impose an "adult" sentence without a jury finding regarding his age at the time of the offenses.  The court rejected this argument and imposed an LWOP term on the murder count.  It acknowledged it had the discretion to impose a lesser term of 25 years to life because appellant was under age 18 when he committed the murder (see Pen. Code, § 190.5), but declined to exercise that discretion in light of appellant's long juvenile court history and the "heinous" nature of the current offenses.

## II.  DISCUSSION

A.  *LWOP Sentence as Cruel and Unusual Punishment*

Appellant was sentenced to LWOP under Penal Code section 190.5, subdivision (b), which provides "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances . . . has been found to be true . . . who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life

---

[2] Keith Kellum was charged as a codefendant, but he pled guilty to second degree murder before the jury was sworn.

without the possibility of parole or, at the discretion of the court, 25 years to life." This provision has been judicially construed to establish a presumption that LWOP is the appropriate term for a 16- or 17-year-old defendant, and to make an LWOP sentence "generally mandatory." (*People v. Guinn* (1994) 28 Cal.App.4th 1130, 1141-1142 (*Guinn*); see also *People v. Murray* (2012) 203 Cal.App.4th 277, 282; *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1089 (*Ybarra*).) We noted this presumption in our original opinion in this matter. (*Blackwell*, *supra*, 202 Cal.App.4th at p. 159.)

In *Miller*, *supra*, 567 U.S. ___ [132 S.Ct. 2455], the high court invalidated mandatory LWOP terms as cruel and unusual punishment under the Eighth Amendment of the United States Constitution when applied to juvenile offenders convicted of homicide offenses. Building on precedents that had categorically barred the death penalty for juveniles convicted of homicide (*Roper v. Simmons* (2005) 543 U.S. 551, 560), and LWOP sentences for juveniles convicted of nonhomicide offenses (*Graham v. Florida* (2010) 560 U.S. 48 [130 S.Ct. 2011, 2030]), the court explained, "The Eighth Amendment forbids a sentencing scheme that mandates life in prison without the possibility of parole for juvenile offenders. [Citation.] By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." (*Miller*, 567 U.S. at p. ___ [132 S.Ct. at p. 2469].) The court in *Miller* discussed in great detail the reasons that juveniles are "constitutionally different" than adults for sentencing purposes, including their lack of maturity and undeveloped sense of responsibility, their vulnerability to outside pressure and negative influences, their limited control over their own environment and their inability to extricate themselves from crime-producing settings, and their greater ability to change due to their possession of a character that is not as "well formed" as an adult's. (*Id*. at p. 2464.)

Penal Code section 190.5, subdivision (b) differs from the mandatory schemes found unconstitutional in *Miller* because it gives the court the discretion to impose a term that affords the possibility of parole in lieu of an LWOP sentence. But, as noted, the statute has been construed to create a presumption in favor of LWOP. This presumption

6

is contrary to the spirit, if not the letter, of *Miller*, which cautions that LWOP sentences should be "uncommon" given the "great difficulty . . . of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' " (*Miller*, *supra*, 567 U.S. at p. —— [132 S.Ct. at p. 2469].)

The *Miller* decision does not categorically bar LWOP sentences in juvenile homicide cases, but it recognizes that juveniles are different from adults in ways that "counsel against irrevocably sentencing them to a lifetime in prison." (*Miller*, *supra*, 567 U.S. at p. —— [132 S.Ct. at p. 2469].) Treating LWOP as the default sentence takes the premise in *Miller* that such sentences should be rarities and turns that premise on its head, instead placing the burden on a youthful defendant to affirmatively demonstrate that he or she deserves an opportunity for parole.

The trial court in this case did not refer explicitly to the presumption in favor of LWOP at the sentencing hearing, but it was directed by counsel to two published appellate cases that recognized the presumption. (See *Guinn*, *supra*, 28 Cal.App.4th at pp. 1141-1142; *Ybarra*, *supra*, 166 Cal.App.4th at p. 1089.) We presume the trial court was aware of the applicable law as it existed at the time (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496), and conclude remand is necessary so the court can reconsider the appropriate sentence on the murder count without reference to a presumption in favor of LWOP and with the benefit of the *Miller* opinion.

The Attorney General argues that *Miller* does not apply to appellant's case because recent amendments to California's sentencing law have provided appellant with the opportunity for parole. Subject to exceptions not relevant here, Penal Code section 1170, subdivision (d)(2) retroactively permits a defendant who was sentenced to LWOP for a crime committed as a juvenile to petition the court for recall and resentencing after serving at least 15 years of that sentence.[3] This provision offers the

---

[3] The petition must describe the defendant's remorse and work toward rehabilitation and must allege that one of the following circumstances is true: "(i) The defendant was convicted pursuant to felony murder or aiding and abetting murder

7

possibility of relief some 15 years in the future, but it does not remediate the problem here—imposition of sentence under a scheme that, contrary to the precepts of *Miller*, makes LWOP the presumptive term for a 16- or 17-year-old defendant convicted of special circumstance murder.

Though we return the case to the trial court for a new sentencing hearing, we express no opinion as to the appropriate outcome. At the original sentencing hearing, the trial court cited appellant's lengthy criminal record as a juvenile and the heinous nature of the offense as circumstances supporting an LWOP term. The court may and should consider these factors on remand, but however aggravating the circumstances of this case, the sentencing choice must be without regard to decisional law making LWOP the presumptive term.[4]

B. *Jury Finding of Appellant's Age Under* Apprendi

In his original appeal, appellant challenged his LWOP sentence as unauthorized absent a jury finding of his age at the time of the offenses, arguing that such a finding was required by *Apprendi*, *supra*, 530 U.S. 466. Although we remand for resentencing based on *Miller*, we reach appellant's *Apprendi* claim to avoid on remand (or on further

---

provisions of law. [¶] (ii) The defendant does not have juvenile felony adjudications for assault or other felony crimes with a significant potential for personal harm to victims prior to the offense for which sentence is being considered for recall. [¶] (iii) The defendant committed the offense with at least one adult codefendant. [¶] (iv) The defendant has performed acts that tend to indicate rehabilitation or the potential for rehabilitation, including, but not limited to, availing himself or herself of rehabilitative, educational, or vocational programs, if those programs have been available at his or her classification level and facility, using self-study for self-improvement, or showing evidence of remorse." (Pen. Code, § 1170, subd. (d)(2)(B).) The jury that convicted appellant received instructions on felony murder, meaning he could presumably petition for resentencing under subparagraph (i). Other grounds might also apply.

[4] The California Supreme Court is currently considering the constitutionality of LWOP sentences imposed under Penal Code section 190.5 in light of *Miller*. (*People v. Moffett* (2012) 209 Cal.App.4th 1465, review granted Jan. 03, 2013, S206771 and *People v. Gutierrez* (2012) 209 Cal.App.4th 646, review granted Jan. 03, 2013, S206365.)

review of the sentence imposed on remand) any argument that a jury finding on appellant's age was required. We repeat the analysis in our original opinion.

The probation report indicates appellant was born on August 9, 1989, making him 17 years old when the offenses were committed in February of 2007. Although minors who commit crimes are generally subject to the jurisdiction of the juvenile court, the law provides for a number of exceptions. (See §§ 602, subd. (b), 707, subds. (a)-(d); *People v. Cardona* (2009) 177 Cal.App.4th 516, 523-526 (*Cardona*).)

Under section 602, subdivision (b), a minor who is 14 years of age or older must be prosecuted as an adult if he or she is alleged to have personally killed the victim during a special circumstance murder or to have committed enumerated forcible sex offenses. Section 707, subdivision (d) allows the prosecution to directly file specified charges against certain minors in adult court, without a judicial determination the minor is unfit for treatment under the juvenile law. Section 707, subdivisions (b) and (c) permits a minor 14 years of age or older to be prosecuted as an adult for enumerated offenses if found unfit for treatment under the juvenile law, there being a presumption of unfitness. And section 707, subdivision (a)(1) provides that minors accused of other crimes will be treated as juveniles unless they are 16 years of age or older and are demonstrated to be unfit for treatment under the juvenile law. (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 548-551 (*Manduley*).)

Here, the prosecution directly filed charges against appellant in adult court. It relied on section 707, subdivision (d)(2)(A), which provides, "[T]he district attorney or other appropriate prosecuting officer may file an accusatory pleading against a minor 14 years of age or older in a court of criminal jurisdiction in any case in which any one or more of the following circumstances apply: [¶] . . . The minor is alleged to have committed an offense that if committed by an adult would be punishable by death or imprisonment in the state prison for life." The criminal complaint and the information both alleged appellant "was a minor who was at least 14 years of age at the time of the commission of the above offenses."

Appellant does not dispute the prosecution's authority to directly file a murder charge in adult court when the minor is 14 years of age or older. (See *Manduley*, *supra*, 27 Cal.4th at pp. 562, 567, 573, 581 [rejecting various constitutional challenges to direct-filing provision of § 707, subd. (d)].) Nor does he argue his case should have been handled in juvenile court. Rather, he claims the imposition of an "adult sentence" violated his Sixth Amendment right to a jury trial because the jury in his case was never asked to determine whether he was "at least 14 years of age" when he committed the offenses. Appellant relies on the rule set forth in *Apprendi*, in which the United States Supreme Court held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." (*Apprendi*, *supra*, 530 U.S. at p. 490.)

Appellant's argument appears to go as follows: Had he been treated as a juvenile and found to have committed the charged offenses, he would have been made a ward of the juvenile court and committed to the Division of Juvenile Facilities for a period lasting up until his 25th birthday. (See § 607, subd. (b); *Cardona*, *supra*, 177 Cal.App.4th at p. 530.) A juvenile commitment until the age of 25 was, therefore, the statutory maximum commitment under *Apprendi* unless the prosecution proved under section 707, subdivision (d)(2)(A) that (1) he committed an offense which would be punishable by life imprisonment if committed by an adult, and (2) he was 14 years of age or older— circumstances that would in turn allow the prosecution to directly file the case in adult court and, consequently, secure adult court punishment. Appellant argues that because the jury was never asked to determine his age, it never made a finding on the second "element" allowing for greater punishment as an adult. We disagree with appellant's reasoning.

*Apprendi* and its progeny (e.g., *Ring v. Arizona* (2002) 536 U.S. 584, 609; *Blakely v. Washington* (2004) 542 U.S. 296, 303-304; *United States v. Booker* (2005) 543 U.S. 220, 233, 243; *Cunningham v. California* (2007) 549 U.S. 270, 274-275) "are rooted in the historic jury function—determining whether the prosecution has proved each element of an offense beyond a reasonable doubt." (*Oregon v. Ice* (2009) 555 U.S. 160, 163

[decision to impose consecutive sentences not subject to *Apprendi*].) The Supreme Court "has not extended the [*Apprendi*] . . . line of decisions beyond the offense-specific context that supplied the historic grounding for the decisions." (555 U.S. at p. 163.) It is "important to recognize that, under the [*Apprendi*] line of high court decisions . . . ., the constitutional requirement of a jury trial and proof beyond a reasonable doubt applies only to a fact that is 'legally essential to the punishment' [citation], that is, to 'any fact that exposes a defendant to a greater potential sentence than is authorized by the jury's verdict alone [citation]." (*People v. Black* (2007) 41 Cal.4th 799, 812.)

Appellant was charged with and convicted of special circumstance murder, residential burglary, and attempted residential robbery. Age was not an element of any of these offenses, rather, "the resolution of appellant's age merely determine[d] which branch of the superior court [would] decide his guilt or innocence." (*People v. Nguyen* (1990) 222 Cal.App.3d 1612, 1621 (*Nguyen*); see also *People v. Marquez* (1992) 1 Cal.4th 553, 580 [age is not an element of murder under Pen. Code, § 190.5 and is not material to guilt].) In light of the murder charge, the district attorney was authorized to directly file this case in adult court without a finding that appellant was unfit to be treated as a juvenile, so long as appellant was 14 years of age or older at the time of the offenses. (§ 707, subd. (d).) If appellant had believed the case was not properly before the adult court due to his actual age, it was his duty to object to that forum and to prove by a preponderance of the evidence that he did not meet the age criterion for direct filing. (See *In re Harris* (1993) 5 Cal.4th 813, 837-838 (*Harris*); *People v. Level* (2002) 97 Cal.App.4th 1208, 1211-1213; *Nguyen*, at p. 1619.)[5]

Appellant did not object to being prosecuted in adult court and is now precluded from arguing the case should have been handled by the juvenile court. (*Harris*, *supra*, 5 Cal.4th at pp. 837-838.) Because his case was heard in adult court, the "maximum penalty" for *Apprendi* purposes was determined when the jury returned its guilty verdict

---

[5] A defendant bears the burden of proof on the issue of age. (*Nguyen*, *supra*, 222 Cal.App.3d at pp. 1618-1623; see also Pen. Code, § 190.5, subd. (a).)

11

on the charge of first degree murder with special circumstances. No additional fact finding by the judge was required to impose an "adult" sentence.

Our conclusion that *Apprendi* did not require a jury finding on appellant's age is consistent with the holding in *Cardona*, *supra*, 177 Cal.App.4th 516, in which the court considered a similar issue regarding the right to a jury determination of the facts rendering a juvenile eligible for prosecution as an adult. In *Cardona*, the defendant was charged with committing a number of felony sexual offenses while he was between the ages of 16 and 18 that rendered him at least presumptively unfit to be dealt with under juvenile court law. (*Id*. at pp. 521-526.) The trial court concluded the defendant was unfit for treatment as a juvenile after considering the statutory criteria for fitness under section 707, subdivision (c), which include: "(1) The degree of criminal sophistication exhibited by the minor. [¶] (2) Whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction. [¶] (3) The minor's previous delinquent history. [¶] (4) Success of previous attempts by the juvenile court to rehabilitate the minor. [¶] (5) The circumstances and gravity of the offenses alleged in the petition to have been committed by the minor." Relying on *Apprendi*, the defendant argued his prison sentence of 30 years to life was unauthorized because the jury, rather than the trial court, should have determined the issue of fitness. (*Cardona*, at pp. 521, 528.)

The appellate court in *Cardona* rejected the claim. It explained: "The factual findings involved in a fitness determination are not the functional equivalent of an element of a crime. 'The sole purpose of the fitness hearing is to determine whether the best interest of the minor and of society will be served by retention in the juvenile court or whether the minor should be tried as an adult. [Citation]' [Citation.] A transfer hearing 'does not directly result in an adjudication of guilt or delinquency' [citation], and the question of the minor's amenability to treatment within the juvenile court system is concerned with the child's prospects for rehabilitation, not the degree of his or her criminal culpability [citation]. A finding that a minor is not amenable to treatment in the juvenile system 'does not increase the maximum penalty one can receive if punished according to the facts as reflected in the jury verdict alone.' [Citation.] Moreover, even

12

assuming juveniles have indeed historically been afforded the right to trial by jury on allegations they committed a crime [citation], we are aware of no historical practice extending that right to a fitness determination.  [¶] The constitutional concerns expressed in *Apprendi* and its progeny were satisfied in the present case by the jury's finding, beyond a reasonable doubt, of those facts legally essential to the punishment imposed, viz., that appellant committed the offenses.  Appellant's sentence was fully authorized by the jury's verdict; the statutory provision for judicial factfinding with respect to amenability to treatment in the juvenile court system is not 'a legislative attempt to "remove from the [province of the] jury" the determination of facts that warrant punishment for a specific statutory offense . . . . [A]s *Apprendi*'s core concern is inapplicable to the issue at hand, so too is the Sixth Amendment's restriction on judge-found facts.' "  (*Cardona*, *supra*, 177 Cal.App.4th at p. 532.)

Similarly, the facts subjecting appellant to a direct filing in criminal court under section 707, subdivision (d)(1)—his age and the nature of the charges against him—do not implicate *Apprendi*'s core concern, namely "the historic right to a trial by jury on all elements of an offense, which would be jeopardized if a legislature could label facts affecting the length of the authorized sentence for an offense as something other than elements, thereby eliminating the right to a jury trial thereon."  (*Cardona*, *supra*, 177 Cal.App.4th at p. 530.)  The Sixth Amendment was not violated by the direct filing of criminal charges in adult court, or by the imposition of an "adult" sentence without a jury determination of appellant's age.

What, then, was the maximum sentence authorized by the verdict? The mandatory sentence for an adult defendant convicted of first degree special circumstance murder is LWOP when the death penalty has not been sought.  (Pen. Code, §§ 190, subd. (a), 190.2, subd. (a).)  Penal Code section 190.5, subdivision (b), provides for a term of LWOP when the defendant was 16 or 17 years old at the time of the offense, but allows the court to impose a lesser sentence of 25 years to life in its discretion.  (*People v. Demirdjian* (2006) 144 Cal.App.4th 10, 17.)  And a defendant who was age 14 or 15 at the time he or she committed a special circumstance murder would face a maximum sentence of

13

25 years to life if prosecuted as an adult.  (*Ibid*.)  Thus, LWOP is the statutory maximum sentence for a defendant tried in adult court who was 16 years of age or older and 25 years to life is the maximum sentence for a juvenile defendant who was 14 or 15 years of age.  (*Ibid*.)

We do not understand appellant to be arguing that the maximum sentence in his case was limited to 25 years to life absent a finding he was at least 16 years old at the time he committed the offenses.  In any event, we view the fact of a defendant's age in this three-tiered structure for special circumstance murder in a noncapital case (LWOP for defendants who were age 18 or over, LWOP or 25 years to life for defendants who were ages 16 or 17, and 25 years to life for defendants who were ages 14 or 15) as a circumstance that mitigates punishment, to which the right to a jury trial under *Apprendi* does not apply.  (See *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1229-1230; *People v. Cleveland* (2001) 87 Cal.App.4th 263, 267.)  Because the trial court determined appellant was 17 years old at the time of his offense, the maximum sentence for *Apprendi* purposes was LWOP.

Even if we assume the jury should have determined whether appellant was 14 years of age or older, the failure to obtain such a finding was harmless beyond a reasonable doubt.  (*Washington v. Recuenco* (2006) 548 U.S. 212, 221; *People v. Sandoval* (2007) 41 Cal.4th 825, 838.)  The charging documents alleged appellant was over 14, and his age was uncontested at trial.  The probation report indicated appellant was 17 years old when he committed the charged offenses, and revealed that his active history with the juvenile justice system began in 2002, making it highly unlikely he was still under the age of 14 when he committed the current offenses in 2007.  In a pretrial motion to set aside the information under Penal Code section 995, the defense asserted appellant "was 17 years old at the time of the alleged offense."  During his police interview, appellant essentially admitted he was 17.  Had the issue been submitted to the jury, the verdict would have surely authorized the sentence imposed.  (*Sandoval*, at p. 838.)

## III.  DISPOSITION

Appellant's LWOP sentence is vacated and the matter is remanded to the superior court for resentencing consistent with the views expressed in *Miller* and in this opinion. The judgment is otherwise affirmed.

_____

NEEDHAM, J.

We concur.

_____

JONES, P. J.

_____

SIMONS, J.