Filed 10/21/13  P. v. Stratis CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B229255 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA083187) |
| v. | |
| CHRISTOPHER STRATIS et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed in part, reversed in part and remanded with directions.

Leslie Conrad, under appointment by the Court of Appeal, for Defendant and Appellant Christopher Stratis.

Jeralyn Keller, under appointment by the Court of Appeal for Defendant and Appellant Victor Manuel Maurtua III.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

# I.  INTRODUCTION

Defendants, Christopher Stratis and Victor Manuel Maurtua III, were convicted of the first degree murder of Michelle Hsu Hong (Pen. Code,[1] § 187, subd. (a)) in the commission of a burglary (§ 190.2, subd. (a)(17)(G)).  The case was simultaneously tried before two separate juries.  Defendants were sentenced to life in prison without the possibility of parole (LWOP) because of the burglary special circumstance finding.

Stratis and Maurtua both contend there was insufficient evidence to support the burglary-murder special circumstance finding and both maintain that their LWOP sentences constituted cruel and/or unusual punishment under the state and federal Constitutions.  Stratis additionally argues the trial court improperly imposed a parole revocation fine.

We hold the presumption of a LWOP sentence for Stratis under section 190.5, subdivision (b) violated the Eighth Amendment under *Miller v. Alabama* (2012) ___ U.S. ___ [132 S.Ct. 2455, 183 L. Ed. 2d 407].  We additionally hold the parole revocation fine was improperly imposed and that Stratis's presentence custody credit requires recalculation.  In all other respects the judgments are affirmed.

# II.  THE EVIDENCE

## A.  A Home Invasion Robbery is Planned and Executed

Christopher Santana told Christine Alegre (Victor Maurtua's cousin) that he wanted to invade the Hong home when the occupants were present and that he had been watching the home for a while.  He explained his ex-girlfriend lived in the home but expressed concern that her brother was "kind of buff."  Santana suggested committing the

---

[1]  All further statutory references are to the Penal Code unless otherwise noted.

robbery while his ex-girlfriend and her brother were home—he indicated he could tie up the brother and place him in a closet with his ex-girlfriend.

On March 19, 2008, Alegre and her friend Magali Fernandez were picked up at Alegre's home by Santana and Maurtua. Santana was driving a van. They proceeded to Ontario to pick up Christopher Stratis. On the trip home the three men spoke about committing a home invasion robbery.

Santana stopped the van near the home of Stratis's foster mother in Duarte. Stratis wanted to break into the safe in the home. The three men got out of the van and put on latex gloves. One of them was carrying a backpack. They abandoned their plan when they noticed people were home. Stratis said, "We're going to have to come back."

Santana drove the van past the Hong home. A car was exiting the driveway. Santana commented: "[O]h, this is the house. . . . [L]ook how big this house is." Santana said, "Okay, we're going to do this right now because the gate is open." The three men exited the van. Santana took a backpack containing a Glock .40-caliber semiautomatic handgun and covered his face with a bandana. Stratis covered his head with the hood of his black sweatshirt. All three men put on latex gloves.

The three men entered the garage of the Hong home. Santana continued inside the house while Stratis and Maurtua stayed in the garage. Shots were fired in the home— Santana had shot Hong three times while she was speaking to a 911 operator. One of her wounds was "rapidly" fatal. The men fled the scene.

Alegre had driven the van away but returned to pick up the men when she received a phone call from Santana. Stratis was quiet and remained calm for the remainder of the day. Santana got into the driver's seat of the van and drove it past the Hong home. They observed an ambulance and police cars. Alegre asked, "Did you hurt somebody?" Santana replied, "What do you think?"

The group stopped by Santana's home. The three men exited the van and returned a few minutes later. Alegre asked Santana, "Who did you shoot?" Santana responded,

3

"Some bitch."  The group proceeded to Maurtua's residence where they sat in the backyard for a brief time.

With the assistance of a police dog, officers followed defendants' trail to a road nearby the Hong home.  They recovered two pairs of surgical booties, discarded clothing including a black hooded sweatshirt, and a backpack containing a loaded Glock .40-caliber semiautomatic handgun and a crescent wrench.

## B.  The Police Interviews of Stratis and Maurtua

Maurtua and Stratis were interviewed by police detectives.  Their interviews were played for their respective juries only.  A summary of the relevant portions of the interviews follows.

### 1.  Stratis

Stratis referred to Santana by his moniker "Vicious" and said Santana was "crazy" given the "way he looks and the way he acts towards people."  Stratis was contacted by Santana the night before the home invasion robbery and agreed to do a "house lick," i.e., a home invasion robbery.

They initially stopped near a house in Duarte.  The men exited the car with gloves on but abandoned the idea of going into the house because a female was observed in the window and there was a daycare next to the home.

When they reached the Hong home, Maurtua provided Stratis with gloves.  Santana had a backpack.  Stratis had the hood to his sweater over his head.  The three men jumped over a wall and entered the Hong garage through a side door.  Stratis heard gunshots and fled.  His two companions caught up to him and the three men jogged to a dead end street.  The men discarded many items during their flight—Santana threw his backpack, Maurtua dropped the gloves and Stratis took off his black "hoodie" sweater.

4

Santana called one of the girls in the van. The van arrived, the men entered it, and Santana drove it away.

## 2. Maurtua

Maurtua knew Santana was associated with an El Monte criminal street gang and had the moniker "Vicious." Prior to committing the crime at the Hong residence, Santana spoke to Maurtua about Santana's participation in home invasion robberies. Santana described the crimes as "[J]ust freakin' simple." Santana said he had been to a party at the Hong home and that it was a "big house." He explained the girl who lived there had a brother who was "kind of buff" but that, if the girl and the brother happened to be home, he would "just kill them."

When the men exited the van at the Hong home, Maurtua saw Santana holding a backpack. Maurtua confirmed all three men put on latex gloves and that Santana had a bandana over his face. After the men jumped a fence, Santana unzipped the backpack and removed a gun. Maurtua was shocked. As Santana was entering the home with the gun in his hand, Maurtua observed Hong walk by and look in their direction. Maurtua heard Hong calling 911 and then heard the gunshots. Santana exited the home, unzipped the backpack and placed the gun inside of it. He tossed the backpack away as they fled the scene. After the men reached the van, Santana said he shot Hong because she saw him.

## III. DISCUSSION

### A. Sufficiency of Evidence Supporting the Special Circumstance

Section 190.2, subdivision (d) provides: "[E]very person, not the actual killer, who, with *reckless indifference to human life* and as *a major participant*, aids, abets,

5

counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4." (Italics added.)

"In [the context of section 190.2, subdivision (d)], . . . the phrase 'major participant' is commonly understood and is not used in a technical sense peculiar to the law. The common meaning of 'major' includes 'notable or conspicuous in effect or scope' and 'one of the larger or more important members or units of a kind or group.' (Webster's New Internat. Dict. [3d ed. 1971] p. 1363.)" (*People v. Proby* (1998) 60 Cal.App.4th 922, 933-934.)

"[T]he culpable mental state of 'reckless indifference to life' is one in which the defendant 'knowingly engage[s] in criminal activities known to carry a grave risk of death' ([*Tison v. Arizona* (1987)] 481 U.S. [137,] 157) . . . ." (*People v. Estrada* (1995) 11 Cal.4th 568, 577; accord, *People v. Mil* (2012) 53 Cal.4th 400, 417.) Further, "This mental state thus requires the defendant be '*subjectively* aware that his or her participation in the felony involved a grave risk of death.' ([*People v. Estrada, supra,* 11 Cal.4th at p. 577.])" (*People v. Mil, supra,* 53 Cal.4th at p. 417.)

It is undisputed Santana shot Hong. Thus, the life without parole sentence imposed on Stratis and Maurtua rested on a finding that they were major participants in the crime and acted with reckless indifference to human life. (§ 190.2, subd. (d); *Tison v. Arizona, supra,* 481 U.S. at pp. 157-158; *People v. Mil, supra,* 53 Cal.4th at pp. 408-409; *People v. Estrada, supra,* 11 Cal.4th at p. 575.)

Our Supreme Court set forth the applicable standard of review in *People v. Barnes* (1986) 42 Cal.3d 284 at page 303: "The proper test to determine a claim of insufficient evidence in a criminal case is whether, on the entire record, a rational trier of fact could find [defendant] guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d

6

557, 576-578; *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) In making this determination, the appellate court '"must view the evidence in a light most favorable to [the verdict] and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citations.] . . . "[O]ur task . . . is twofold. First, we must resolve the issue in the light of the *whole record . . . .* Second, we must judge whether the evidence . . . is *substantial . . . .*"' (*People v. Johnson, supra,* 26 Cal.3d at pp. 576-577, italics in original.)" (Accord, *People v. Griffin* (2004) 33 Cal.4th 1015, 1028.)

The evidence demonstrated Stratis and Maurtua knew what they were getting into when they arrived at the Hong home with Santana. Both men agreed to commit a home invasion robbery with Santana —a person whose moniker was "Vicious." Stratis described Santana as "crazy." Maurtua knew he was associated with a criminal street gang, was armed with a handgun, and intended to "just kill" the girl who lived in the home as well as her brother if they were present during the robbery. The men operated together and attempted to avoid identification—Maurtua put on a white bandana, Stratis pulled the hood up on his sweatshirt, and all three men wore latex gloves. Stratis and Maurtua jumped a fence with Santana and the three men entered Hong's garage together. After gunshots rang out, Stratis and Maurtua fled with Santana and left Hong to die.

There was substantial evidence from which a rational trier of fact could conclude Stratis and Maurtua were major participants in the crime who acted with reckless indifference to human life. (See *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1116-1117; *People v. Mora* (1995) 39 Cal.App.4th 607, 617; *People v. Bustos* (1994) 23 Cal.App.4th 1747, 1751, 1754-1755.)

B.  Cruel and/or Unusual Punishment

1.  Stratis

Stratis was sentenced to LWOP pursuant to section 190.5, subdivision (b).  That provision provides the punishment for a defendant who commits a first degree murder, with one or more specified special circumstance, and is 16 years of age or older and under 18 years at the time of the offense, "*shall* be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life." (§ 190.5, subd. (b), italics added (190.5).)

Although the Legislature did not explain the burden of establishing whether the sentence should have a determinate element to it, courts have examined the issue and concluded that the statutory language creates a presumption in favor of LWOP.  (See *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1089; *People v. Guinn* (1994) 28 Cal.App.4th 1130, 1141-1142.)  This interpretation of section 190.5 has never been questioned or criticized.  Moreover, by taking no action to amend the statute after the judicial interpretation of it, the Legislature has suggested that the interpretation is consistent with its intent (*People v. Davis* (1994) 7 Cal.4th 797, 828 [The Legislature "well knows how to" amend a statute in response to a judicial decision it disfavors]).

Stratis was sentenced in December 2010—long after the publication of cases identifying a presumption of LWOP in section 190.5.  We must assume the trial court was aware of the law as it existed at the time Stratis was sentenced.  (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496.)  Indeed, it appears the trial court applied the presumption as it referred to LWOP as "the *mandatory* indeterminate state prison term provided by law" and then stated it "respectfully deni[ed] the defense request to exercise . . . discretion and allot an indeterminate term of 25 years to life . . . ."  (Italics added.)   In other words, it appears the trial court began with the presumption that the law

8

required the imposition of LWOP and then rejected defense counsel's argument that such a presumption was rebutted.

Approximately 18 months after Stratis was sentenced, the United States Supreme Court decided *Miller v. Alabama, supra,* ___ U.S. at p. ___ [132 S.Ct. at p. 2455] (*Miller*). *Miller* held a statutory scheme that required the imposition of LWOP for a defendant who committed murder while under the age of 18 years old violated the prohibition of cruel and unusual punishment set forth in the Eighth Amendment. (*Id.* at p. 2461.) In reaching its decision the high court made the following observation.

"Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself —no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Miller, supra,* 132 S.Ct. at p. 2468.)

*Miller* instructed the "appropriate occasions for sentencing juveniles to this harshest possible penalty will be *uncommon*. That is especially so because of the great difficulty . . . of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the *rare* juvenile offender whose crime reflects irreparable corruption.' [Citations.]" (*Miller, supra*, 132 S.Ct. at p. 2469, italics added.) After *Miller,* a sentencing court is "require[d] . . . to take into account how children are different, and how those differences counsel *against* irrevocably sentencing them to a lifetime in prison." (*Ibid.*, italics added, fn. omitted.)

9

We recognize section 190.5 does not provide for a *mandatory* LWOP sentence. However, the presumption in favor of LWOP established by case law and followed by the trial court is contrary to *Miller's* instruction that LWOP be an "uncommon" penalty imposed on the "rare" juvenile after consideration of circumstances corresponding to the juvenile's age. After *Miller*, in order to comply with the Eighth Amendment, LWOP can no longer be the default sentence for a juvenile who commits first degree murder with a special circumstance.[2]

Because the sentencing court did not have the benefit of *Miller* and its attendant guidelines, we remand Stratis's case in order for the court to impose sentence after applying the considerations identified in *Miller* to Stratis.[3] We express no opinion on whether a sentence of LWOP imposed on Stratis after consideration of the *Miller* factors would pass constitutional muster.[4]

---

[2] We respectfully acknowledge the point made by the dissent that, after the passage of recent legislation, language in section 1170, subdivision (d)(2)(H) may eventually allow Stratis to be released from prison despite the imposition of a life without parole sentence. However, Stratis's sentence was imposed under a scheme that, contrary to *Miller*, made LWOP the presumptive term. The legislation cited by the dissent may render a post-*Miller* LWOP sentence constitutional but, in our view, that is an issue for another day.

[3] Based on our determination that the manner in which Stratis's sentence was imposed was contrary to the Eighth Amendment's prohibition against cruel *and* unusual punishment it is unnecessary to separately analyze whether the sentence also violated the protection under the California Constitution against cruel *or* unusual punishment (Cal. Const., art. I, § 17). The use of the disjunctive in the California Constitution does not, under these circumstances, affect the analysis of Stratis's claim. (See *People v. Lewis* (2004) 120 Cal.App.4th 837, 854, fn. 5; *People v. Mantanez* (2002) 98 Cal.App.4th 354, 358, fn. 7.)

[4] There are two cases pending in the California Supreme Court that may reach the issue of whether a presumption in favor of LWOP in section 190.5 violates the Eighth Amendment— *People v. Gutierrez,* S206365 (Issue identified: "Does the sentence of life without parole imposed on this juvenile offender under Penal Code section 190.5, subdivision (b), violate the Eighth Amendment under [*Miller v. Alabama, supra,* 132 S.Ct. at p. 2455]?") and *People v. Moffett,* S206771 (issue is not identified in the order

10

## 2. Maurtua

Maurtua argues his life without parole sentence violates California's prohibition against cruel or unusual punishment (Cal. Const., art. I, § 17) because the penalty is disproportionate to his criminal culpability. He asserts he did not intend to kill; he did not commit any violent act; he did not know Santana was armed; he did not think there was anyone in the home; and his criminal record was not extensive.

It is true that "a statutory punishment may violate [California's] constitutional prohibition not only if it is inflicted by a cruel or unusual method, but also if it is *grossly disproportionate* to the offense for which it is imposed." (*People v. Dillon* (1983) 34 Cal.3d 441, 478, italics added, fn. omitted.) However, Maurtua engaged in highly culpable conduct. (*People v. Blackwell* (2011) 202 Cal.App.4th 144, 157.) First degree special circumstance murder has been described as, "[P]erhaps the most serious offense under California law . . . ." (*People v. Blackwell, supra,* 202 Cal.App.4th at p. 158.) As explained in part III(A) above, Maurtua actively participated in the planning and execution of a home invasion robbery. Maurtua has not demonstrated his sentence is disproportionate to his individual culpability. He does not offer any comparison with punishment in other cases. His sentence of LWOP did not violate the Constitution. (See *People v. Murray* (2012) 203 Cal.App.4th 277, 284-285; *People v. Blackwell, supra,* 202 Cal.App.4th at pp. 158-159; *People v. Johnson* (2010) 183 Cal.App.4th 253, 296-299.)

## C. Stratis's credit for time served

We sought and received letter briefs from the parties regarding the accuracy of Stratis's presentence custody credit. On June 7, 2010, defendant was sentenced in case No. BA360589 on two felony drug offenses to a pair of two-year concurrent sentences.

---

granting review but the Court of Appeal held the presumption of LWOP in section 190.5 violates the Eighth Amendment under *Miller*).

Defendant received 609 days of total credits which included 304 days of conduct credits. His LWOP sentence in this case was imposed on December 1, 2010. Stratis received credit for 1,148 days of time actually served in custody prior to the imposition of sentence.

Stratis was a sentenced prisoner on December 1, 2010, when he was sentenced to prison in the homicide case. He was not entitled to dual credits while serving his drug conviction sentences and awaiting trial and sentencing in this case. (*In re Joyner* (1989) 48 Cal.3d 487, 489; *In re Rojas* (1979) 23 Cal.3d 152, 155-156.) The Attorney General argues defendant should only receive 449 days of presentence credits. Based on the record before us, we cannot determine the precise presentence credits to which defendant is entitled. Defendant is not entitled to 305 days of credit he served awaiting his sentencing in case No. BA360589. That much is clear. Further, defendant is not entitled to credit for the time he was serving the two-year sentences in case No BA360589. That too is clear. But he would no longer be in prison custody when he was paroled on the two-year sentences in case No BA360589. We have no records indicating when he was paroled or deemed to be so.

The most appropriate remedy is to allow the trial court to recalculate Stratis's presentence credits in this case. This will allow the parties to develop a full record as to when defendant was paroled in case No. BA360589. It is entirely possible that defendant was paroled in No. BA360589, or deemed to be so, prior to December 1, 2010, the date he was sentenced in this case. If this occurred, then the post parole period would not raise any issue of improper dual credits. Upon remittitur issuance, the trial court is to recalculate defendant's presentence credits in this case.

D. Maurtua's Parole Revocation Restitution Fine

The trial court imposed a $200 parole revocation restitution fine (§ 1202.45) on Maurtua. However, the parole revocation restitution fine does not apply to a life without

the possibility of parole sentence.  (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1184; *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183; see *People v. McWhorter* (2009) 47 Cal.4th 318, 380 [death sentence].)  The imposition of that fine is reversed as to Maurtua.  The abstract of judgment must be amended in this respect.

## V.  DISPOSITION

Christopher Stratis's sentence of life in prison without the possibility of parole is reversed and the matter is remanded for resentencing with adherence to the guidelines set forth in *Miller v. Alabama* (2012) ___ U.S. ____ [132 S.Ct. 2455, 183 L. Ed. 2d 407].  In addition Stratis's award of presentence custody credit is reversed and the trial court is to recalculate the presentence credit award as discussed in part III(A)(2) of this opinion.  The judgment against Victor Manuel Maurtua is modified to omit the parole revocation restitution fine imposed under Penal Code section 1202.45.

In all other respects, the judgments are affirmed.  The clerk of the superior court is to prepare amended abstracts of judgment consistent with this opinion and the resentencing proceedings on remand and deliver them to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KUMAR, J.[*]

.

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

13

I concur in the lead opinion's thorough and well-stated analysis except I would not remand for resentencing. Penal Code[1] section 1170, subdivision (d)(2) provides defendant with a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. (Stats. 2012, ch. 828, § 1; *Miller v. Alabama* (2012) 567 U.S. ___, ___ [132 S.Ct. 2455, 2469] (*Miller*); see *People v. Caballero* (2012) 55 Cal.4th 262, 268-269 (*Caballero*).) Thus, the sentence at issue is no longer unconstitutional on its face. Nor is defendant's life without parole sentence unconstitutional as applied. Defendant will be provided with a reasonable opportunity to secure his release after serving 15 years of his sentence and thereafter as specified in section 1170, subdivision (d)(2)(H).

I recognize the following language utilized by the United States Supreme Court can be construed to require resentencing, "Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller*, *supra*, 567 U.S. at p. ___[132 S.Ct. at p. 2469], fn. omitted.) However, in *Miller*, *supra*, the high court only addressed the issue of whether a defendant must be provided a meaningful opportunity to secure release based on the stated factors. The high court expressly indicated that a defendant who committed the killing while a minor (or is otherwise legally culpable for the homicide) could receive a life without parole sentence. (*Ibid.*) The high court never held federal constitutional error occurred when such a sentence was imposed; only that there must be some meaningful opportunity to secure release at some time. Further, the high court never held that a presumption in favor of a life without parole sentence was unconstitutional so long as there was a meaningful opportunity to secure release. I view this as an extraordinarily close issue. But the issue resolved in *Miller*, *supra*, did not extend to questions of presumptions or sentencing schemes where a defendant was initially precluded from securing release. (*Miller*, *supra*, at p. ___, ___ [132 S.Ct. at pp. 2460, 2469].) Thus,

---

[1] Future statutory references are to the Penal Code.

*Miller*, *supra*, is not controlling authority in terms of whether defendant is entitled to resentencing given the availability of relief pursuant to section 1170, subdivision (d)(2). (*Landgraf v. USI Film Products* (1994) 511 U.S. 244, 265 ["[T]he 'maxim not to be disregarded that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used.'"]; *R.A.V. v. City of St. Paul, Minn.* (1992) 505 U.S. 377, 386-387, fn. 5 [it is "contrary to all traditions of our jurisprudence to consider the law on this point conclusively resolved by broad language in cases where the issue was not presented or even envisioned"].)

Nor is defendant entitled to resentencing under *Caballero*, *supra*, at pages 268-269. *Caballero*, filed August 16, 2012, was decided prior to Governor Edmund G. Brown's September 30, 2012 approval of the section 1170, subdivision (d)(2) amendments. (*Caballero*, *supra*, at p. 262.) The *Caballero* decision does not discuss the section 1170, subdivision (d)(2) amendments. (*Caballero*, *supra*, at pp. 265-269.) Moreover, the section 1170, subdivision (d)(2) amendments had no application to the defendant in *Caballero* because he received consecutive indeterminate terms with a 110-year minimum. Section 1170, subdivision (d)(2) only applies when the defendant is sentenced to a sentence of life in prison without possibility of parole. (§ 1170, subd. (d)(2)(A)(i).) The remedy adopted in *Caballero*, remand for resentencing or the filing of a habeas corpus petition for other defendants, has no direct application here. (*Caballero*, *supra*, at pp. 268-269.) The Legislature has adopted a specific remedy for a person such as defendant who has received an actual life without parole sentence. None of defendant's constitutional cruel or unusual punishment contentions premised on *Miller* and *Caballero* warrant reversal of his life without parole sentence.

Nor is there anything in the record on *direct appeal* that warrants a remand for resentencing. Defendant was sentenced to life without parole by Judge Mike Camacho. The misunderstanding about the presentence probation report, although it was error on multiple levels, did not prejudice defendant. A presentence probation report would have revealed defendant had been previously convicted of two felonies and sentenced to prison

2

by Judge Craig Veals while awaiting trial in the murder case. The section 1203c, subdivision (a)(1) post-judgment probation report expressly refers to the two convictions and the state prison sentence. Being sentenced to prison on two narcotics offenses while awaiting trial on the murder case is not evidence of demonstrated maturity and rehabilitation as those terms are used in *Miller*. There is no likelihood Judge Camacho would have imposed a 25 years to life sentence after discovering defendant had sustained two felony convictions and been sentenced to prison. Under any prejudiced-based standard of reversible error, the absence of a probation report and the ensuing confusion about the document was harmless. (*Chapman v. California* (1986) 386 U.S. 18, 22; *People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Dobbins* (2005) 127 Cal.App.4th 176, 182-183 [failure to provide updated probation report harmless].)

Finally, defendant argues he is entitled to resentencing so he can present evidence of demonstrated maturity and rehabilitation. There might be some probative force to defendant's resentencing contention if there was some basis for a finding of newfound maturity and rehabilitation. Defendant participated in the killing of Michelle Hsu Hong on March 19, 2008. Defendant was not arrested until February 4, 2009. While awaiting trial, defendant was convicted of two felony drug counts. Defendant was sentenced by Judge Veals to prison on June 10, 2010. Defendant was then sentenced to life without parole by Judge Camacho on December 1, 2010. Defendant was nearly 20 years old when he was sentenced. Since the commission of the March 19, 2008 homicide, there was no basis for concluding defendant had demonstrated newfound maturity and rehabilitation. In the intervening time period, he had been convicted of two felonies while in custody awaiting trial and sentenced by Judge Veals to prison. *Based upon the record on direct appeal*, there was no basis for a finding of newfound maturity and rehabilitation and no likelihood Judge Camacho would have found such occurred.


TURNER, P. J.

3

MOSK, J., Concurring and dissenting

I concur in the decision to remand the matter for sentencing as to defendant Stratis, although I believe upon remand the trial court should impose a 25-year-to-life sentence. I dissent as to the sentence imposed on Maurtua and believe his sentence also should be 25 years to life.

The sentence of life without the possibility of parole should not have been imposed on either of the defendants in this case.

There is not substantial evidence that either defendant knowingly engaged in activity he subjectively knew involved a grave risk of death and thus acted with a reckless indifference to human life—requirements for the life without parole sentence in this case. (Pen. Code, § 190.2, subd. (d); *People v. Estrada* (1995) 11 Cal 4th 568, 575.) There is no evidence that either planned or directed the burglary or knew prior to the burglary that the shooter was armed. The evidence shows that the house to be burglarized was chosen because it was believed to be unoccupied at the time. They had abandoned another potential burglary site because they saw that someone was home. There is evidence that defendants began to leave as soon as they saw there was someone in the house, and that while they were leaving, they heard the shots. The shooter expressed some anger that he had been abandoned. There is no evidence either defendant knew prior to the burglary that the shooter had a gun.

When the burglary was underway, Maurtua—who was 19 years old—was "shocked" to see the gun. There is no evidence Stratis saw any gun. It is true that a month earlier—not just before the crime—in discussing home invasion robberies the shooter said to Maurtua that if the occupants of the house they ultimately burgled were home, he would kill them. There is no indication that Maurtua took this seriously. There is no indication that either defendant had a history of any violence.

The Supreme Court has stated, "'[T]he culpable mental state of "reckless indifference to life" is one in which the defendant "knowingly engag[es] in criminal activities known to carry a grave risk of death" . . . .' (*People v. Estrada, supra*, 11 Cal.4th at p. 577.) This mental state thus requires the defendant be '*subjectively* aware that his or her participation in the felony involved a grave risk of death.' (*Ibid.*, italics added.)" (*People v. Mil* (2012) 53 Cal.4th 400, 417.)

The "statutory language of Penal Code section 190.2(d) . . . derives verbatim from the United States Supreme Court's decision in *Tison v. Arizona* (1987) 481 U.S. 137 [(*Tison*)]." (*People v. Estrada, supra,* 11 Cal.4th at p. 575 [citations omitted]. Subsection (d) was added to § 190.2 in order to bring California law into conformity with the *Tison* decision. (See *id.*); *People v. Proby* (1998) 60 Cal.App.4th 922, 927-928; *People v. Bustos* (1994) 23 Cal.App.4th 1747, 1753. *Tison* involved two brothers sentenced to death for committing first degree murder in connection with armed robbery, kidnapping and theft of a motor vehicle. The U.S. Supreme Court held that the death penalty may be imposed constitutionally under the Eighth and Fourteenth Amendments on an accomplice to a felony-murder where there was "major participation in the felony committed, combined with reckless indifference to human life." (*Tison, supra,* at p. 158.)

Because "*Tison* is the source of the language of section Penal Code 190.2(d) . . . the constitutional standards set forth in that opinion are therefore applicable to *all* allegations of a felony-murder special circumstance [under California law], regardless of whether the People seek and exact the death penalty or a sentence of life without parole." (*People v. Estrada, supra,* 11 Cal.4th at pp. 575-576.) The court in *Tison* observed that "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a *highly culpable mental state* . . . ." (*Tison, supra,* 481 U.S. at pp. 157-158, italics added.) The Court noted that although "major participation" and "reckless indifference to human life" are distinct requirements, they will frequently overlap. (*Ibid.*)

2

The evidence is uncontradicted that defendants thought that they were burglarizing an empty house. There is no evidence that they knew or suspected that any weapon would be used. They waited outside while the shooter went into the house and fled when they heard shots, leaving the shooter by himself. There is no evidence that defendants were "subjectively aware that their . . . participation in the felony involved a grave risk of death." (*People v. Estrada, supra,* 11 Cal.4th at p. 577.) Indeed, there is not substantial evidence that they were subjectively aware that there was any risk of death. They may have been major participants in the burglary, but that does not mean they had "'a reckless indifference to the value of human life.'" (*Id.* at p. 576.)

This is not a case like *People v. Bustos, supra,* 23 Cal.App.4th 1747 in which defendant knew during the robbery that the killer, his accomplice, was waiting outside with a knife. Nor is this case comparable to *People v. Proby, supra,* 60 Cal.App.4th 922 in which the defendant and his accomplice, the killer, were both armed during a robbery. Here, there was not sufficient evidence that defendants acted with the necessary reckless indifference to human life.

I also agree with Justice Breyer's concurring opinion in *Miller v. Alabama* (2012) 567 U.S.__, __ [132 S.Ct. 2455, 2476] that "transferred intent" concept that underlies the felony-murder doctrine is not sufficient to satisfy the intent to murder that might subject a juvenile to a sentence of life without parole.

I join in to form a majority that, as to Stratis, the matter be remanded to the trial court for resentencing. In the event the sentence exceeds 25 year to life, Stratis can then appeal. I would reduce Maurtua's sentence to 25 years to life.

MOSK, J.

3