Filed 6/27/16  P. v. Castaneda CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JESUS RICARDO CASTANEDA,<br><br>    Defendant and Appellant. | F070715<br><br>(Tulare Super. Ct.<br>No. VCF274709B)<br><br><br>**OPINION** |

-ooOoo-

**THE COURT**\*

APPEAL from a judgment of the Superior Court of Tulare County.  Gary L. Paden, Judge.

Marcia R. Clark, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Catherine Chatman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\* Before Kane, Acting P.J., Poochigian, J. and Franson, J.

## INTRODUCTION

Defendant/appellant Jesus Ricardo Castaneda was born March 1995.  He had a lengthy juvenile record and was on juvenile probation at the time he committed first degree murder, with special circumstances, on October 20, 2012, four months before his 18th birthday.  The trial court imposed a sentence of life without parole (LWOP) pursuant to Penal Code[1] section 190.5, subdivision (b), after an analysis of relevant sentencing factors as set forth in *Miller v. Alabama* (2012) ___ U.S.  ___ [132 S.Ct. 2455] (*Miller*).  Castaneda contends the sentence is cruel and/or unusual and must be reversed.  We disagree and affirm.

## FACTUAL AND PROCEDURAL SUMMARY

Pablo Calderon and Abel Calderon were cousins who were as close as brothers. At one time, Pablo was a Northern gang member; he dropped out while in prison for a robbery.  Abel was a former member of a Southern gang subset.  It was not a good idea for Abel to hang out with Pablo, because the Southerners considered Abel to be active still in the Northern gang.

The neighborhood where Pablo and his family lived was dominated by Northern gang members and a lot of his family belonged to the Northern gang.  There was a house in the neighborhood where Northern gang members hung out; Pablo met Castaneda there and knew that Castaneda was a member of the North Side Visa Boys, a subset of the Northern gang.  Pablo and Castaneda has been friends for a few years; and Castaneda often visited Pablo's home.

In the fall of 2012, there was some tension between the Northern and Southern gangs.  There had been several incidents in which Southern gang members shot at Northern gang members.  Castaneda was injured in one of those incidents.

---

[1] References to code sections are to the Penal Code unless otherwise specified.

On September 25, 2012, there was a large Quinceañera party. At the party, a group of Northern gang members, including Victor Moran, were present. Abel also was present. The Northerners would stare at Abel and then talk amongst themselves; they were warned they would be kicked out if they started trouble.

Pablo and Abel were together the night of October 19, 2012, and into the morning of October 20. They started out drinking and talking with one of Pablo's cousins, then ended up on the porch of Pablo's grandmother's house. At the time, Pablo lived there with several family members. Pablo and Abel were sitting on the porch drinking beer and listening to music.

Around midnight of October 20, Castaneda walked over from his girlfriend's house, which was next door. Castaneda accepted a beer; shared a cigar with Abel; talked for awhile; then left. At that point, Pablo went into the house to use the restroom.

From inside the house, Pablo heard "popping noises." Pablo ran back out and saw that Castaneda had returned and was pointing a gun at Abel. Moran stood nearby. Pablo saw flashes from the gun, after which Castaneda and Moran ran in the direction of Moran's house. Pablo briefly gave chase, but returned quickly to check on Abel.

Abel was on the floor of the porch, bleeding profusely. Pablo called 911 and asked for an ambulance. Meanwhile, Pablo's uncle, Tim Carrasco, had been awakened by the first shot. When he heard three more shots, he could tell they were close and Carrasco called 911 to report shots fired at his home. While on the phone, Carrasco walked outside and saw that Abel had been shot. Abel was bleeding heavily and the 911 dispatcher coached Carrasco on how to try and stem the bleeding. Eduardo Calderon lived across the street and came outside after hearing the shots.

Police and ambulance personnel eventually arrived and took over. When the ambulance arrived, Carrasco, Calderon, and Pablo were asked to move away from the porch and out of the yard. Once they had moved away, Pablo told both Carrasco and Calderon that Castaneda was the shooter, and that Moran had been with Castaneda.

3.

Abel was pronounced dead at the hospital. Abel had been shot four times, including two shots to his torso, both of which were fatal. The bullets had been fired from a distance of two or three feet. There were no bullets around the porch or house. Abel bled to death as a result of the gunshot wounds.

On the day following the murder, Pablo spoke with Abel's father, Abel Calderon, Sr., and Pablo told him everything that had happened. Pablo thought Castaneda had killed Abel because Abel was a Southerner. Pablo offered to kill Castaneda; Abel Sr. told him not to and to go to the police with the information. Pablo and Abel Sr. went together to the police department, and Pablo told the investigating detective everything.

Law enforcement began a search for Castaneda and Moran. A search warrant was executed at Moran's residence. Two shotguns and five types of ammunition were found. Moran was arrested on October 21, 2012, after a traffic stop.

An extensive search was conducted for Castaneda; however, it was unsuccessful for several months. Finally, in February 2013, Castaneda was detained in Phoenix, Arizona, pursuant to the arrest warrant issued as a result of the shooting, and Castaneda was returned to California.

On July 26, 2013, an information was filed in Tulare County charging Castaneda with one count of murder, a violation of section 187, subdivision (a); the special circumstance that the murder was carried out by an active gang member to further the activities of the criminal street gang within the meaning of section 190.2, subdivision (a)(22), was alleged. It also was alleged that a principal in the offense intentionally and personally discharged a firearm, causing death, within the meaning of section 12022.53, subdivisions (c), (d) and (e)(1).

Further, it was alleged that Castaneda was subject to the provisions of section 186.22, subdivisions (b)(1)(C) and (b)(4) in that he committed the felony for the benefit of a criminal street gang with the specific intent to promote or further criminal conduct by gang members.

4.

Finally, the People alleged that Castaneda was properly charged in adult criminal court pursuant to Welfare and Institutions Code section 707, subdivision (d)(1), in that he was 16 years or older at the time of the offense, and the charged offense was set forth in Welfare and Institutions Code section 707, subdivision (b).

A jury trial commenced on September 30, 2014. Officer Shane Logan testified as an expert on gangs. In Logan's opinion, Castaneda was an active Norteño gang member at the time of the killing. Castaneda was known by his gang moniker and had been found in the company of Norteños on at least eight occasions when officers were responding to or investigating crimes. During at least four police contacts, Castaneda admitted Norteño gang membership. Logan also opined that Moran was an active Norteño. Logan was of the opinion the killing had been committed in association with and for the benefit of a criminal street gang.

On October 7, 2014, the jury found Castaneda guilty of first degree murder and found the special circumstance and all the other allegations and enhancements true.

Castaneda was sentenced on December 11, 2014, to life without the possibility of parole. A consecutive term of 25 years to life was imposed for the firearm enhancement.

Castaneda filed a timely notice of appeal on December 18, 2014.

## DISCUSSION

Castaneda's sole contention in this appeal is that imposition of LWOP in this case constitutes cruel and/or unusual punishment under the federal and state Constitutions. He maintains the Eighth Amendment to the United States Constitution, as construed in *Miller*, forbids imposition of an LWOP sentence on a juvenile offender except when the facts show said juvenile is beyond redemption. He asserts the facts do not support an LWOP sentence and the sentence is cruel and/or unusual punishment. We disagree.

### Constitutional Analysis

The Eighth Amendment to the United States Constitution applies to the states. (*People v. Caballero* (2012) 55 Cal.4th 262, 265, fn. 1.) It prohibits the infliction of

"cruel *and* unusual" punishment. (U.S. Const., 8th Amend., italics added.) Article I, section 17 of the California Constitution prohibits infliction of "[c]ruel *or* unusual" punishment. (Italics added.) The distinction in wording is "purposeful and substantive rather than merely semantic. [Citations.]" (*People v. Carmony* (2005) 127 Cal.App.4th 1066, 1085.) As a result, we construe the state constitutional provision "separately from its counterpart in the federal Constitution. [Citation.]" (*People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1136.) This does not make a difference from an analytic perspective, however (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358, fn. 7), and defendant does not contend the provisions should be separately analyzed in his case (see *People v. Blackwell* (2011) 202 Cal.App.4th 144, 158, disapproved on another ground in *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1370–1371, 1387). The touchstone in each is gross disproportionality. (See *Ewing v. California* (2003) 538 U.S. 11, 21 (lead opn. of O'Connor, J.); *Rummel v. Estelle* (1980) 445 U.S. 263, 271; *People v. Dillon* (1983) 34 Cal.3d 441, 479.) Whether a punishment is cruel and/or unusual is a question of law subject to our independent review, but underlying disputed facts must be viewed in the light most favorable to the judgment. (*People v. Abundio* (2013) 221 Cal.App.4th 1211, 1217; *People v. Felix* (2003) 108 Cal.App.4th 994, 1000.)

As the analytic framework for a claim that punishment is excessive requires reference to " 'the evolving standards of decency that mark the progress of a maturing society[]' " (*Atkins v. Virginia* (2002) 536 U.S. 304, 311–312), the United States Supreme Court's views with respect to the sentencing of juvenile offenders have been evolving for some time. One theme has remained constant for decades: the recognition that "children are constitutionally different from adults for purposes of sentencing." (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2464].)

In *Roper v. Simmons* (2005) 543 U.S. 551 (*Roper*), the U.S. Supreme Court held the Eighth Amendment forbids imposition of the death penalty on juvenile offenders under 18 years of age. (*Roper*, *supra*, at p. 568.) It observed that the Eighth Amendment

6.

requires that capital punishment "be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.' [Citation.]" (*Ibid.*) Yet, "[t]hree general differences between juveniles under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders. First, as any parent knows and as the scientific and sociological studies … tend to confirm, '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults …. These qualities often result in impetuous and ill-considered actions and decisions.' [Citations.]" (*Id.* at p. 569.) Second, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. [Citation.]" (*Ibid.*) Third, "the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed. [Citation.]" (*Id.* at p. 570.) Thus,

> "[t]he susceptibility of juveniles to immature and irresponsible behavior means 'their irresponsible conduct is not as morally reprehensible as that of an adult.' [Citation.] Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. [Citation.] The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, '[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.' [Citations.]" (*Ibid.*)

Because of juveniles' "diminished culpability," the court found, the penological justifications for the death penalty – retribution and deterrence – apply to them with less force than to adults. (*Roper*, *supra*, 543 U.S. at p. 571.) The court acknowledged "the brutal crimes too many juvenile offenders have committed," and conceded an argument

7.

could be made that "a rare case might arise in which a juvenile offender has sufficient psychological maturity, and at the same time demonstrates sufficient depravity, to merit a sentence of death." (*Id*. at p. 572.) Nevertheless, it found it necessary to adopt a categorical rule barring imposition of the death penalty on anyone under the age of 18, rather than permitting consideration of mitigating arguments related to youth on a case-by-case basis: "The differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability. An unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth as a matter of course, even where the juvenile offender's objective immaturity, vulnerability, and lack of true depravity should require a sentence less severe than death." (*Id*. at pp. 572–573.) The high court concluded: "It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.… When a juvenile offender commits a heinous crime, the State can exact forfeiture of some of the most basic liberties, but the State cannot extinguish his life and his potential to attain a mature understanding of his own humanity." (*Id*. at pp. 573–574.)

Five years later, in *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), the U.S. Supreme Court relied heavily on *Roper* to hold: "The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide. A State need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term." (*Graham*, *supra*, at p. 82.) The court stated: "Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults. [Citation.]" (*Id*. at p. 68.) Turning to the nature of the offenses to which LWOP might

8.

apply, the court "recognized that defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers," and so "[i]t follows that, when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability." (*Id*. at p. 69.)

The court observed that LWOP "is 'the second most severe penalty permitted by law' " (*Graham*, *supra*, 560 U.S. at p. 69), and "an especially harsh punishment for a juvenile. Under this sentence a juvenile offender will on average serve more years and a greater percentage of his life in prison than an adult offender." (*Id*. at p. 70.) The court determined that retribution – a legitimate reason to punish – could not support such a sentence: "*Roper* found that '[r]etribution is not proportional if the law's most severe penalty is imposed' on the juvenile murderer. [Citation.] The considerations underlying that holding support as well the conclusion that retribution does not justify imposing the second most severe penalty on the less culpable juvenile nonhomicide offender." (*Id*. at pp. 71–72.) Deterrence likewise did not justify the sentence; because juveniles lack maturity and a fully developed sense of responsibility, they are "less likely to take a possible punishment into consideration when making decisions." (*Id*. at p. 72.)

The court further found that incapacitation – also a legitimate reason for imprisonment given the serious risk recidivism poses to public safety – could not justify an LWOP sentence for juveniles who did not commit homicide. (*Graham*, *supra*, 560 U.S. at p. 72.) The court reasoned: "To justify life without parole on the assumption that the juvenile offender forever will be a danger to society requires the sentencer to make a judgment that the juvenile is incorrigible. The characteristics of juveniles make that judgment questionable." (*Id*. at pp. 72–73.) "A life without parole sentence improperly denies the juvenile offender a chance to demonstrate growth and maturity." (*Id*. at p. 73.)

Finally, the court considered the penological goal of rehabilitation, and concluded an LWOP sentence could not be justified by that goal. (*Graham*, *supra*, 560 U.S. at

pp. 73–74.)  It explained:  "The penalty [of LWOP] forswears altogether the rehabilitative ideal.  By denying the defendant the right to reenter the community, the State makes an irrevocable judgment about that person's value and place in society.  This judgment is not appropriate in light of a juvenile nonhomicide offender's capacity for change and limited moral culpability."  (*Id*. at p. 74.)

The court concluded:  "In sum, penological theory is not adequate to justify life without parole for juvenile nonhomicide offenders.  This determination; the limited culpability of juvenile nonhomicide offenders; and the severity of life without parole sentences all lead to the conclusion that the sentencing practice under consideration is cruel and unusual.  *This Court now holds that for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole.*  This clear line is necessary to prevent the possibility that life without parole sentences will be imposed on juvenile nonhomicide offenders who are not sufficiently culpable to merit that punishment."  (*Graham*, *supra*, 560 U.S. at p. 74, italics added.)

*Miller* was decided two years after *Graham*, and drew extensively from that opinion and from the *Roper* opinion.  In *Miller* and its companion case, two 14-year-old offenders were convicted of murder and sentenced to LWOP, the term mandated by state law.  (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2460].)  Because "[s]uch a scheme prevents those meting out punishment from considering a juvenile's 'lessened culpability' and greater 'capacity for change,' [citation]" and runs afoul of the requirement in the high court's cases of "individualized sentencing for defendants facing the most serious penalties," the court held "*mandatory* life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' "  (*Ibid*., italics added.)

*Miller* reiterated many of the findings of *Graham* and *Roper* with respect to children's "distinctive (and transitory) mental traits and environmental vulnerabilities," as

10.

determining the appropriateness of a lifetime of incarceration without the possibility of parole. (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2465].) The court stated: "By removing youth from the balance – by subjecting a juvenile to the same life-without-parole sentence applicable to an adult – [mandatory penalty schemes] prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender. That contravenes *Graham*'s (and also *Roper*'s) foundational principle: that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." (*Id*. at p. ___ [132 S.Ct. at p. 2466].)

The high court required "that a sentencer have the ability to consider the 'mitigating qualities of youth,' " which, it observed, " 'is more than a chronological fact.' [Citation.] It is a time of immaturity, irresponsibility, 'impetuousness[,] and recklessness.' [Citation.] It is a moment and 'condition of life when a person may be most susceptible to influence and to psychological damage.' [Citation.] And its 'signature qualities' are all 'transient.' [Citation.]" (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2467].) The court explained:

> "So *Graham* and *Roper* and our individualized sentencing cases alike teach that in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult. To recap: Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features – among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him – and from which he cannot usually extricate himself – no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth – for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even

11.

when the circumstances most suggest it." (*Id*. at p. ___ [132 S.Ct. at p. 2468].)

In *Miller,* the U.S. Supreme Court observed that the juvenile in one case was not the killer, nor did the prosecution argue he intended to kill. Rather, he was convicted as an aider and abettor. Although he knew his companion had a gun, the court found his age may have affected his calculation of the risk it posed, as well as his willingness to disengage from his companions before anything happened. In addition, his family background was one of violence, with both his mother and grandmother having previously shot other individuals. (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2468].) Although the juvenile in the other case committed a "vicious" murder, he and his companion did so when high on drugs and alcohol consumed with the adult victim. Moreover, the juvenile's background was one of neglect and physical abuse, as well as four suicide attempts, the earliest when he was kindergarten age. The high court found it "beyond question" that the juvenile deserved "severe punishment" for killing the victim, but, in each of the cases, also found the sentencer needed to examine all the circumstances before concluding LWOP was the appropriate penalty. (*Id*. at p. ___ [132 S.Ct. at p. 2469].)

The high court stated:

> "We therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. [Citation.] By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment. Because that holding is sufficient to decide these cases, we do not consider [the juveniles'] alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger. But given all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate

12.

yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.] Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller*, *supra*, 567 U.S. at p. ___, fn. omitted [132 S.Ct. at p. 2469, fn. omitted].)

The court reiterated: "Our decision does not categorically bar a penalty for a class of offenders or type of crime – as, for example, we did in *Roper* or *Graham*. Instead, *it mandates only that a sentencer follow a certain process – considering an offender's youth and attendant characteristics – before imposing a particular penalty*. And in so requiring, our decision flows straightforwardly from our precedents: specifically, the principle of *Roper*, *Graham*, and our individualized sentencing cases that youth matters for purposes of meting out the law's most serious punishments…." (*Miller*, *supra*, 567 U.S. at p. ___, italics added [132 S.Ct. at p. 2471, italics added].)

California's statutory scheme has long afforded trial courts sentencing discretion where defendants who were tried as adults were 16 or 17 years old when they committed murder. Thus, subdivision (b) of section 190.5 provides: "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances … has been found to be true …, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life."

Properly construed so as not to impose a presumption in favor of LWOP, "the sentencing regime created by section 190.5[, subdivision ](b) authorizes and indeed requires consideration of the distinctive attributes of youth highlighted in *Miller* …." (*People v. Gutierrez*, *supra*, 58 Cal.4th at p. 1361.) Accordingly, the statute "confers discretion on a trial court to sentence a 16- or 17-year-old juvenile convicted of special circumstance murder to life without parole or to 25 years to life …." (*Id*. at p. 1360.) In

exercising that discretion, "the trial court must consider all relevant evidence bearing on the 'distinctive attributes of youth' discussed in *Miller* and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders.' [Citation.] To be sure, not every factor will necessarily be relevant in every case. For example, if there is no indication in the presentence report, in the parties' submissions, or in other court filings that a juvenile offender has had a troubled childhood, then that factor cannot have mitigating relevance. But *Miller* 'require[s] [the sentencer] to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' [Citation.]" (*Id.* at p. 1390.)

### *Exercise of Discretion*

At sentencing, the trial court noted that it had reviewed the probation report, and the probation report "goes through" the *Miller* analysis. Castaneda was a violent man, having committed multiple assaults as a juvenile, between November of 2007 and October 2011, before committing murder four months before his 18th birthday. He also committed other offenses as a juvenile and was on juvenile probation at the time of the murder. Castaneda's record showed multiple unprovoked assaults on others; that he failed to participate in court ordered anger management; and he had continued to associate with gang members despite probation conditions.

The trial court opined that attempts at rehabilitation as a juvenile offender clearly had been unsuccessful. The trial court described the murder as an "execution" in which Castaneda was the actual shooter; noted Castaneda had induced another gang member to participate in the murder; and Castaneda exhibited a high degree of planning and sophistication in carrying out the murder. After the murder, Castaneda fled the scene and was arrested several months later in Arizona.

It also was noted by the trial court that Castaneda came from a "good family, good upbringing" but chose a gang lifestyle; nothing in his family background explained his

14.

numerous criminal offenses.  His family members did not have criminal records and Castaneda's school records showed he obtained B's and C's in his classes.  The trial court also opined that Castaneda "never has shown any remorse for what he did" and "might be somewhat proud of the fact that maybe this will give him more clout or more status in his gang."

The probation report recommended Castaneda be sentenced to LWOP.  The trial court, after reviewing the probation report and analyzing the *Miller* factors, concluded "I don't see any indication that he can ever be rehabilitated, and that is clear from his juvenile record where he was given substantial efforts for rehabilitation.  So I'm adopting the probation report [recommendation]."

As required by *Miller*, the trial court here "consider[ed] all relevant evidence bearing on the 'distinctive attributes of youth' … and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders.' [Citation.]" (*Gutierrez, supra*, 58 Cal.4th at p. 1390.)  It " '[took] into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' [Citation.]" (*Ibid*.)  The sentence it imposed did not violate the federal or state Constitution.  (*People v. Palafox* (2014) 231 Cal.App.4th 68, 91–92.)

The trial court here thoughtfully weighed the applicable factors, including Castaneda's youth, his juvenile criminal record, family background and upbringing, and the circumstances of the murder offense, and concluded Castaneda was unfit ever to reenter society.  We cannot say it exceeded the bounds of reason, all of the circumstances being considered, under section 190.5, subdivision (b).  (*People v. Palafox, supra,* 231 Cal.App.4th at p. 91.)

## DISPOSITION

The judgment is affirmed.